**BETHLEHEM STEEL CORPORATION and Affiliated Subsidiary Companies,**

v.

**UNITED STATES of America.**

**No. CIV. A. 98–3417.**

United States District Court, E.D. Pennsylvania.

Aug. 3, 2000.

**450**

Eric Kraeutler, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, Melvin E. Lefkowitz, Morgan, Lewis & Bockius, LLP, Washington, DC, for plaintiffs.

Stuart D. Gibson, U.S. Dept. of Justice, Tax Division, Washington, DC, for Defendant.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

This tax refund case has been brought before the Court on the parties' cross-motions for summary judgment. For the reasons which follow, the Defendant's motion shall be granted, while the plaintiff's motion is denied.

### Factual Background

Prior to 1986, certain "investment tax credits" were available to domestic manufacturers who invested in equipment and other materials to modernize their production capabilities. Any tax credits that a manufacturer did not use in a given year could be carried back for a three-year period or carried forward for the fifteen subsequent years and used to reduce taxes for those years. Tax credits that were not used by the end of the 15 year carry forward period were lost. Under the 1986 Tax Reform Act, the investment tax credit ("ITC") was eliminated, effective for property placed in service after December 31, 1985. However, in recognition of the reliance that many domestic steel companies had placed upon it in their tax planning, Congress enacted Section 212 of the Tax Reform Act ("TRA") whereby steel manufacturers could obtain a cash refund for their accumulated unused tax credits by treating 50% of their existing, unused carry-forwards of ITC to offset their 1987 tax liability.

Like most other domestic steel producers, Plaintiff, Bethlehem Steel had accumulated a significant amount of investment tax credits in the ten-year period preceding the enactment of the TRA. Because Bethlehem and most other eligible steel companies anticipated large refunds from the application of Section 212 but would not be in a position to file their 1987 tax returns until the Fall of 1988, they negotiated with the Internal Revenue Service to obtain the release of the anticipated overpayments early. Two meetings were held between representatives of the steel companies and the IRS in February and March, 1988, culminating in the execution between the parties of a Closing Agreement on Final Determination Covering Specific Matters on March 9, 1988 along with the filing by Bethlehem on March 15, 1988 of an Election and Claim for Quick Release of Overpayment Resulting From the Application of Section 212 of the Tax Reform Act of 1986. The Election/Claim included regular investment tax credit carry forwards in the aggregate amount of $280,856,047 from the tax years 1976–1986. Fifty percent of the unused credits or $140,428,024 was claimed as a credit against Bethlehem's federal income tax for 1987. The Election/Claim stated that Bethlehem had no 1987 unpaid Chapter 1 tax liability as of March 15, 1988 and therefore it claimed an overpayment and received a refund in the amount of $140,428,024 on March 25, 1988.

On November 10, 1988, subsequent to the negotiation and execution of the Closing Agreement and related documents, the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA") was passed which, among other things, retroactively amended § 212 by providing that investment tax credits earned in periods after December 31, 1985 could not be included in existing carry forwards. § 1019 of TAMRA made this change effective retroactively to the effective date of § 212 of TRA. Thus, the

last year for which the investment tax credit could be utilized was 1985.

Following the audit of the consolidated tax return that Bethlehem had filed for 1987 and 1988, the IRS determined that $11,381,450 of unused investment tax credits attributable to 1986 should be disallowed and it accordingly adjusted Bethlehem's tax liability to reflect that it owed an additional $5,690,725. Although Bethlehem paid this sum and the related interest assessed on it under protest, it reserved its right to file for a refund. On June 27, 1997, Plaintiff filed an amended U.S. Income Tax Return Form 1120X with the IRS seeking a refund of the 1987 income tax of $5,690,725 plus interest. When the IRS disallowed the claimed refund, this action ensued with Plaintiff arguing that the language in the closing agreement that "no change or modification of applicable statutes will render this agreement ineffective with respect to the terms agreed to herein," renders the TAMRA amendment inapplicable to divest it of its investment tax credit for 1986.

### Standards Applicable to Summary Judgment Motions

The standards to be applied by the district courts in ruling on motions for summary judgment are set forth in Fed. R.Civ.P. 56. Under subsection (c) of that rule,

.... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Pursuant to this rule, a court is compelled to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty Lobby, Inc.*
*v. Dow Jones & Co.*, 838 F.2d 1287 (D.C.Cir.1988), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Aries Realty, Inc. v. AGS Columbia Associates*, 751 F.Supp. 444 (S.D.N.Y.1990).

Generally, the party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a summary judgment motion, the court must view the facts in the light most favorable to the non-moving party and all reasonable inferences from the facts must be drawn in favor of that party as well. *U.S. v. Kensington Hospital*, 760 F.Supp. 1120 (E.D.Pa.1991); *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F.Supp. 1169 (E.D.Pa.1990). *See Also: Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3rd Cir.1989); *Tziatzios v. U.S.*, 164 F.R.D. 410, 411, 412 (E.D.Pa.1996).

### Discussion

Closing Agreements are authorized under 26 U.S.C. § 7121, which provides:

(a) **Authorization.**—The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.

(b) **Finality.**—If such agreement is approved by the Secretary (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer,

employee, or agent of the United States, and

(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.

 A closing agreement is a contract, and generally is interpreted under ordinary contract principles. *Rink v. Commissioner of Internal Revenue*, 47 F.3d 168, 171 (6th Cir.1995); *Smith v. United States*, 850 F.2d 242, 245 (5th Cir. 1988). Construction of a contract is different than interpretation—in determining the legal effect an agreement will have on an event the parties did not foresee, the process is construction, not interpretation. *Williams v. Metzler*, 132 F.3d 937, 946 (3rd Cir.1997). Interpretation of the contractual language is the first step towards proper construction and in the process of interpreting a contract, the court seeks to ascertain the intent of the parties. *Id.*, citing *Barco Urban Renewal Corp. v. Housing Authority*, 674 F.2d 1001, 1008

(3rd Cir.1982) and *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009–1012 (3rd Cir.1980). If the essential terms of an agreement are deemed unambiguous, a court will not look beyond the four corners of the document to determine the parties' intent as an interpretation that gives a reasonable meaning to all parts of the contract is preferable to one that leaves portions of the contract meaningless. *Rink, supra.* However, where an ambiguity exists, extrinsic evidence may be considered to clarify the agreement's meaning such as the situation of the parties, the attendant circumstances, the structure of the contract, the bargaining history and the conduct of the parties that reflects their understanding of the contract's meaning and the ends they sought to achieve. *Williams v. Metzler*, 132 F.3d at 946–947; *American Cyanamid Company v. Fermenta Animal Health Company*, 54 F.3d 177, 180–181 (3rd Cir.1995).

In this case, given the silence of the closing agreement itself on the exact amount of the plaintiff's refund and on the means by which that refund was to be calculated,[1] on consideration of the parties'

---

1. The Closing Agreement in this case reads as follows:

WHEREAS, the taxpayer anticipates an overpayment of its federal income tax liability for its taxable year ending December 31, 1987, resulting from the application of section 212 of the Tax Reform Act of 1986(Act) and desires a quick release by the Internal Revenue Service (Service) of any such overpayment; and

WHEREAS, the taxpayer may be unable to file its federal income tax return for its taxable year ending December 31, 1987, by its due date determined without regard to any time to file extensions.

NOW IT IS HEREBY DETERMINED AND AGREED for federal income tax purposes that:

1) The taxpayer agrees that the amount of limitations for the Service to bring suit to recover any amount of such overpayment claimed by the taxpayer that is determined to be erroneous or excessive shall not expire prior to the expiration of the period of limitations on assessment of tax (including any extended period(s) agreed to by both the Service and the taxpayer) with respect

to the taxpayer's federal income tax return for its taxable year ending December 31, 1987.

2) The taxpayer agrees that the amount determined under section 212 of the Act will be spent within 3 years of the date of the refund for reinvestment in and modernization of its steel operations through investment in modern plant and equipment, research and development, and other appropriate projects such as working capital for steel operations and programs for the retraining of steelworkers, as required by section 212(f) of the Act.

3) The Service agrees to effect a prompt release of any refund due upon the filing by the taxpayer of the election and claim for the quick release of refund.

WHEREAS, the determinations set forth above are hereby agreed to by the Service, and by the taxpayer, including its successors and assigns.

NOW THIS CLOSING AGREEMENT WITNESSETH, that the taxpayer and Commissioner of Internal Revenue hereby mutually agree that the determinations set forth above shall be final and conclusive, subject,

earlier cross-summary judgment motions, this Court found ambiguities in the closing agreement. Following our Order of June 15, 1999 denying both motions, the parties took additional discovery concerning the history and process underlying their discussions and negotiation of the closing agreement. We therefore have now been presented with a more fully-developed record on these matters and it is now clear to this Court that the overriding goal of the Agreement was to expedite Plaintiff's receipt of its refund. The precise amount of the refund, the method by which it was to be calculated and the application of subsequent corrective legislation to that refund were never negotiated terms, while the extension of the statute of limitations, the manner in which the refund was to be expended and the prompt release of the monies owed were. (See, e.g., Deposition of Don McCambridge, pp. 22–23).

Moreover, it further appears that while the plaintiff was aware that there was a discrepancy between the conference report on § 212 and the language of the statute itself as to whether companies that were entitled to the investment tax credit relief were entitled to carryover credit for property placed in service in 1986, this discrepancy was apparently not discussed with or at the meetings with the IRS representatives because the steel companies did not believe that it was necessary. Likewise, the anti-retroactivity clause of the Closing Agreement was never discussed. (McCambridge Deposition, pp. 24–26, 44–45, 50–54, 97–98). Bethlehem Steel, however, knew that technical corrections bills had been introduced and were likely to be enacted to remedy this discrepancy, among others. In fact, prior to TAMRA's passage, the steel companies were endeavoring to lobby Congress to amend the language of § 212 to comport with that contained in the conference report, i.e., to allow the credit carryover to apply to property placed in service in 1986. These lobbying efforts, however, were ultimately unsuccessful. (McCambridge Deposition, pp. 27–30).

It is clear to this Court that had Bethlehem wanted to avoid the risk of a retroactive change in law, it could have negotiated for a determination that its tax liability would be calculated in accordance with existing law. *See, U.S. v. National Steel,* 75 F.3d at 1152. It did not so negotiate and the closing agreement is silent as to the manner in which Bethlehem's tax liability was to be calculated and silent as to the applicability of the ITC to property placed in service after December 31, 1985. The provision on retroactivity depends on the existence of a term of the agreement that might be in conflict with a legislative amendment. *United States v. National Steel Corp.,* 75 F.3d 1146, 1151 (7th Cir. 1996). If a closing agreement does not specifically cover an issue, the IRS is not foreclosed from claiming it. *In re Spendthrift Farm, Inc.,* 931 F.2d 405, 407 (6th Cir.1991), citing *Zaentz v. Commissioner,* 90 T.C. 753, 1988 WL 34876 (1988).

■ Accordingly, we conclude that the closing agreement does not foreclose the retroactive application of the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA") which retroactively amended § 212 by providing that investment tax credits earned in periods after December 31, 1985 could not be included in existing carry forwards. Defendant's motion for summary judgment is therefore granted and plaintiff's motion denied pursuant to the attached order.

### ORDER

AND NOW, this day of August, 2000, upon consideration of the Parties' Renewed Motions for Summary Judgment, it is hereby ORDERED that, for the reasons set forth in the preceding Memorandum Opinion, the Defendant's Motion for Sum-

however, to reopening in the event of fraud, malfeasance, or misrepresentation of material fact; furthermore no change or modifi-

cation of applicable statutes will render this agreement ineffective with respect to the terms agreed to herein.

mary Judgment is GRANTED, the Plaintiff's Motion for Summary Judgment is DENIED and Judgment is entered in favor of Defendant as a matter of law on all Counts set forth in Plaintiff's Complaint.