**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**NATIONAL STEEL CORPORATION,**
**Defendant–Appellant.**

No. 95–2521.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 3, 1996.

Decided Feb. 1, 1996.

Judith A. Stewart, Office of the United States Attorney, Indianapolis, IN, Gary R. Allen, Kenneth L. Greene, Steven W. Parks, Teresa T. Milton (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, Peter Sklarew, Department of Justice, Tax Division, Appellate Section, Washington, DC, for Plaintiff–Appellee.

Michael R. Fruehwald, Ernest J. Szarwark (argued), Barnes & Thornburg, Indianapolis, IN, William F. Conroy, David L. Marshall, Charles E. Jarrett, Baker & Hostetler, Washington, DC, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

POSNER, Chief Judge.

The United States sued National Steel Corporation seeking the return of so much of an income-tax refund as the United States believed exceeded National Steel's actual entitlement. The district court granted summary judgment for the United States and ordered National Steel to pay back the excess portion of the refund, some $2.5 million, plus interest, precipitating this appeal.

Section 212(a) of the Tax Reform Act of 1986, 100 Stat. 2170, entitled qualified steel manufacturers, of which National Steel was one, to apply certain unused tax credits against income tax due in the manufacturer's first taxable year after December 31, 1986, which for National Steel was calendar 1987. By the end of 1987 it was clear to National Steel that, as a result of these credits, it had overpaid its 1987 income tax by a considerable margin and would be entitled to a large refund. But it had not yet filed its tax return for 1987; in fact, it was not to do so until September or December of 1988. (Oddly, the record does not reveal which is the correct month; but it doesn't matter.) In March 1988, National Steel went to the Internal Revenue Service and asked for an anticipatory refund. The Service agreed and on March 11 the parties executed a Form 906 "Closing Agreement on Final Determination Covering Specific Matters," which we print as an appendix to this opinion. The agreement recites that the taxpayer anticipates an overpayment of its federal income taxes for 1987 and desires "a quick release" of the overpayment, that the Service agrees to the quick release upon the filing by the taxpayer of a claim for it, and that the taxpayer agrees both that the statute of limitations for recovering any overpayment shall not start to run until the taxpayer files its tax return for 1987 (the limitations period was later extended to June 30, 1994) and that the taxpayer shall, within three years of the signing of the agreement, reinvest "the amount determined under section 212 of the Act" in its steel operations, such reinvestment being the quid for the 1986 Act's quo of tax relief for steel producers. See section 212(f) of the Act. The agreement also recites that "no change or modification of applicable statutes will render this agreement ineffective with respect to the terms agreed to herein."

A few days after the agreement was executed, National Steel submitted a claim for a $19.2 million refund and the Service issued the refund on March 25. Later that year, however, Congress passed the Technical and Miscellaneous Revenue Act of 1988, 102 Stat. 3342, which amended section 212 of the Tax Reform Act of 1986 to provide that investment tax credits that had accrued in 1986 could not be used to generate section 212 credits. Section 1019 of the 1988 statute applied the statute retroactively to the effective date of section 212. On the strength of this retroactive amendment, the Internal Revenue Service decided that National Steel was not entitled to $2.5 million of the refund it had received, and it brought this suit for the return of that amount. National Steel argues that the Internal Revenue Service's claim is precluded by the provision of the closing agreement forbidding the use of a statute enacted after the agreement to modify the terms of the agreement.

■ Whether this argument is sound is the only substantial issue in the case, but the parties have each injected an insubstantial issue. The taxpayer argues that the suit is barred by the two-year statute of limitations

for the bringing of suits to recover refunds. 26 U.S.C. § 6532(b). It would be if the taxpayer had not agreed to extend the statute of limitations. The taxpayer argues that its agreement is ineffective because no statute authorizes the government to extend the statute of limitations for its refund suits, whereas—showing the omission was not inadvertent, or without significance—there is statutory authorization for the government to do so for refund suits brought against it. 26 U.S.C. § 6532(a)(2). The reason for the asymmetry is obvious, and is of no help to National Steel. A statute of limitations is a defense, and, unless jurisdictional, can be waived by the defendant. Section 6532(a)(2), the provision allowing waiver by the United States of the statute of limitations in refund suits brought by taxpayers, makes clear that the United States has this normal right of defendants, the right to waive the statute of limitations. When the United States is the plaintiff, as in this case, it has no occasion to waive the statute of limitations, because the statute of limitations confers no right on it, so there is nothing for it to waive. Only the defendant (here the prospective defendant in a suit for the recovery of an erroneous refund) can waive the statute of limitations, and did so. No statute precludes such a waiver.

■ The government's insubstantial argument is that the taxpayer never was entitled to use its 1986 tax credits to obtain benefits under section 212 of the Tax Reform Act of 1986. National Steel concedes that the issue was not one withdrawn from future contention by the closing agreement. But it points out that the Act, while generally denying credits for investments made after December 31, 1985, contained an exception for "transition property," defined as property placed in service after December 31, 1985, pursuant to a written contract that took effect before then. Tax Reform Act of 1986, §§ 203(b)(1)(A), 211(e)(1), 212(g)(2)(B), 100 Stat. 2143–44, 2167, 2171. The property on which National Steel claimed 1986 tax credits for use with section 212 was transition property. Against this conclusion the government cites legislative history which it claims shows that Congress did not mean what it clearly said. Of the four items of legislative history that the government cites, one is not

cited fully enough to be locatable; one supports the taxpayer's interpretation, S.Rep. No. 313, 99th Cong., 2d Sess. 115 (1986); one is neutral, H.R.Rep. No. 426, 99th Cong., 1st Sess. 146 (1985); and the last, while it does say that the Tax Reform Act repealed the investment tax credit, obviously was making a general observation rather than attempting to deny the existence of the extensive, explicit statutory provisions that retained the investment tax credit for some taxpayers during a transition period. H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess., vol. 2, p. 51.

■ The government has not made a responsible use of legislative history, and in any event there is no basis in any responsible theory of statutory interpretation for using legislative history to change the meaning of a statute that is clear on its face and does not, if read literally, produce an absurd or unsound result. *Central States, Southeast & Southwest Areas Health & Welfare Fund v. Cullum Cos.*, 973 F.2d 1333, 1339 (7th Cir. 1992); *In re Sinclair*, 870 F.2d 1340, 1341 (7th Cir.1989). There is a helpful analogy to the distinction in contract law between "intrinsic" and "extrinsic" ambiguity. The first is present when from just reading the contract it is apparent that the contract is unclear. The second is present when although the contract is clear at the semantic or literal level, anyone who knew something about the subject matter would realize that the contract probably did not mean what it said. *AM International, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 574–76 (7th Cir.1995). If neither type of ambiguity is present, the court does not take evidence beyond the contract itself. Here there is neither intrinsic nor extrinsic ambiguity. No one reading the statute would think there was any doubt about the meaning of "transition property" or the application of the term to the investments made by National Steel in 1986, and the parties have given us no reason to suppose that anyone knowledgeable in the intricacies of tax law, or investment tax credits, or the steel industry would know that the statute cannot sensibly be understood to mean what it seems to mean.

■ Let us turn, at last, to the closing agreement. The government points out, unhelpfully, that closing agreements are not contracts. What it means is that they are not governed by state contract law, but rather by federal common law contract principles. They certainly are contracts in the ordinary legal sense of the term, because they contain binding promises. The government does not claim to be free to walk away from a closing agreement, and it certainly does not acknowledge the right of a taxpayer to do so. Indeed, the finality of the closing agreement is said to be a reason that the Internal Revenue Service discourages their use, even though they are expressly authorized by statute. 26 U.S.C. § 7121; Michael I. Saltzman, *IRS Practice and Procedure* ¶ 9.09 (2d ed. 1991). The question is whether the closing agreement contains a promise not to apply a new statute to the determination of the taxpayer's section 212 entitlements, and it is a question of contractual interpretation and thus of contract law, albeit of federal rather than of state contract law. The government argues that the ordinary rules of contract law do not apply to closing agreements, but the only cases it cites for this proposition are lower-court decisions no more recent than 1935. Recent cases affirm that for most purposes closing agreements are just like other contracts. *Rink v. Commissioner*, 47 F.3d 168, 171 (6th Cir.1995); *Alexander v. United States*, 44 F.3d 328, 332 (5th Cir.1995).

■ For the sake of simplicity, the starting point in the formulation of a federal common law of contracts should normally be the standard principles of contract law—more precisely, the core principles of the common law of contract that are in force in most states. *Fleming v. United States Postal Service*, 27 F.3d 259, 260–61 (7th Cir.1994). Those principles are then modified to take account of any special characteristics of the federal government as a contracting partner. E.g., *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979); *Powers v. United States Postal Service*, 671 F.2d 1041, 1044–45 (7th Cir.1982). We can think of only two respects bearing on the present case in which closing agreements require different treatment from other contracts. First, the power of rank and file government employees to bind the government by contractual, equitable, or agency principles such as estoppel or apparent authority is more limited than in the case of employees of private entities. A closing agreement, to be valid, requires high-level approval, *Urso v. United States*, 72 F.3d 59, 60 (7th Cir.1995), and the requirement would be undermined if the taxpayer could present the testimony of the IRS agents who had negotiated the agreement that it means something different from what it says. This point suggests that the scope for an evidentiary hearing to resolve issues of intrinsic or extrinsic ambiguity in the interpretation of a closing agreement is more limited than it would be in the case of an ordinary contract. It means in other words that we must strive more mightily than would otherwise be the case to make sense of the contract without ordering a hearing.

■ Second, the power of the executive branch to waive powers granted it by Congress is limited by the Constitution, which (in Article II section 3) requires the President (and his subordinates) to faithfully execute the laws that Congress enacts; there is no corresponding limitation on the powers of signatories to private contracts. If Congress passes a tax law and provides in the law that it is to have retroactive effect, and there is no doubt about the constitutionality of applying the law retroactively, the IRS cannot make a binding contract to enforce the law only prospectively. 4 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates, and Gifts* ¶ 112.1.5, p. 112–16 (2d ed. 1992). But it can settle an existing dispute with finality, and this will often entail a refusal to enforce a new law retroactively. The clearest case would be one in which the IRS and the taxpayer signed a closing agreement that resolved a dispute by specifying a sum certain due from the taxpayer in settlement of the IRS's claim. The IRS could not come back years later and, waving a newly enacted but retroactive statute in the taxpayer's face, declare the settlement a nullity. Rev.Rul. 56–322, 1956–2 Cum.Bull. 963. The settlement process would be undermined if the settlement did not buy the parties peace, subject to the usual grounds for reopening a

settlement, such as fraud. To this extent the IRS can disregard a retroactive law and that is all that the passage about retroactivity in the closing agreement does.

[9] We have referred to the closing agreement as a "settlement" but this is not precise. The IRS and National Steel did not have a dispute. The purpose of the agreement was to expedite National Steel's claim for a refund but to do so by a method that protected the interests of the IRS. Closing agreements are not limited to settlement situations. 4 Bittker & Lokken, *supra,* ¶ 112.1.5, p. 112–17. The device may be used for procedural economy, or to prevent a dispute from arising. An alternative would have been for National Steel to sign a waiver of the statute of limitations with a recital of the conditions of the waiver. 26 U.S.C. § 6501(c)(4); *United States v. Hodgekins,* 28 F.3d 610, 613–14 (7th Cir.1994); *Stenclik v. Commissioner,* 907 F.2d 25, 27 (2d Cir.1990). (It did sign the waiver, but no conditions were specified.) The form used for the agreement is not important. The agreement was not *ultra vires.*

[10] We must see what exactly the parties agreed to in the closing agreement, for, by virtue of the provision on retroactivity, the 1988 amendment to section 212 of the 1986 Act left intact whatever they agreed to. They clearly agreed to a waiver of the statute of limitations, a quick release of the claimed overpayment, and a three-year period for National Steel to carry out its statutory obligation (which carries no deadline) to invest its section 212 tax savings in the manufacture of steel. If the 1988 Act had imposed a one-year deadline on the investment of the tax savings in the manufacture of steel, the deadline would, by reason of the closing agreement, not apply to National Steel. At the same time, National Steel concedes that, because the closing agreement contains no stipulation that the taxpayer is in fact a qualified steel manufacturer for purposes of section 212, the IRS was free to challenge its entitlement to any section 212 benefits on the ground that it is not qualified. The concession alone may well defeat National Steel, because nowhere does the agreement state that National Steel's section 212 entitlements are to be determined without regard to any amendments made to the section after the date of the closing agreement. The provision on retroactivity depends on the existence of a term of the agreement that might be in conflict with a legislative amendment. We gave the example of an amendment fixing a one-year deadline for investing in manufacturing steel, whereas the closing agreement fixes a three-year deadline.

National Steel points to the opening words of the three-year provision: "The taxpayer agrees that the amount determined under section 212 of the Act will be spent within 3 years of the date of the refund...." It interprets this to mean that the closing agreement constitutes a determination of the taxpayer's entitlement to claim credits under the original Act. Not a determination of the amount of those credits. No amount is specified in the closing agreement, or could have been, since the IRS issued its check for the refund days after receiving the taxpayer's barebones claim, which was not self-verifying and which the Service, in accordance with its promise of a quick release, did not attempt to verify. Not the amount, but the methodology for determining the amount, was, the taxpayer argues, what the words "amount determined under section 212" promised it. This is not what the words say or suggest.

[11] The taxpayer argues that if the agreement is not interpreted as freezing the methodology for determining its section 212 credits, it is hopelessly one-sided. Since most though of course not all contracts involve the exchange of things of commensurate value, an interpretation that makes a contract grossly one-sided is suspect. *Rhone–Poulenc Inc. v. International Ins. Co.,* 71 F.3d 1299, 1303 (7th Cir.1995). But there is nothing one-sided about the closing agreement as interpreted by the government. The agreement gave the taxpayer almost $20 million, months, perhaps years, before it would have gotten it in the ordinary course. Remember that National Steel did not file its 1987 tax return until many months after it received the refund, and goodness knows how long it would have taken the IRS to process the return and issue the refund. At a discount rate of 10 percent, the quick release was probably worth at least $2 million to National Steel. As for the risk of an adverse change in law, that was balanced, at least as far as anything in the record shows,

by the ever-present probability that Congress would grant retroactive tax relief, in which event the litigating positions of the parties would be reversed. The adverse change occurred, yet it is still possible that National Steel came out ahead ex post (the amount of the refund ordered returned is only $2.5 million), and it was certainly ahead of the game ex ante.

National Steel points out that the agreement made it invest the refund in its steel operations and to do so within three years, and perhaps it would have preferred to do something else with the money, or at least with the $2.5 million that it invested thinking that the investment cost it nothing because it was in lieu of taxes. But it has presented no evidence that the entire refund, let alone the $2.5 million, exceeded what it expected to invest in its business in the ordinary course over three years, in which event the investment requirement imposed no burden whatsoever.

Had National Steel wanted to avoid the risk of a retroactive change in law, it could have negotiated for a determination that its tax liability would be calculated in accordance with existing law. Such a negotiated determination would not be defiance of Congress on the part of the IRS but, since the Tax Reform Act of 1986, with its retroactive effect, had not yet been enacted, an effort to minimize uncertainty, which is one of the most common motivations for making a contract. We do not find any such determination in the closing agreement, and the judgment in favor of the United States must therefore be

AFFIRMED.

## APPENDIX

### [GOVERNMENT EXHIBIT A]

Closing Agreement On Final Determination

Covering Specific Matters

———

Under section 7121 of the Internal Revenue Code
National Steel Corporation
20 Stanwix Street,
Pittsburgh, Pennsylvania 15222,
Federal I.D. 25–0687210

and the Commissioner of Internal Revenue make the following closing agreement:

WHEREAS, the taxpayer anticipates an overpayment of its federal income tax liability for its taxable year ending December 31, 1987, resulting from the application of section 212 of the Tax Reform Act of 1986 (Act) and desires a quick release by the Internal Revenue Service (Service) of any such overpayment; and

WHEREAS, the taxpayer may be unable to file its federal income tax return for its taxable year ending December 31, 1987, by its due date determined without regard to any time to file extensions.

NOW IT IS HEREBY DETERMINED AND AGREED for federal income tax purposes that:

1) The taxpayer agrees that the period of limitations for the Service to bring suit to recover any amount of such overpayment claimed by the taxpayer that is determined to be erroneous or excessive shall not expire prior to the expiration of the period of limitations on assessment of tax (including any extended period(s) agreed to by both the Service and the taxpayer) with respect to the taxpayer's federal income tax return for its taxable year ending December 31, 1987.

2) The taxpayer agrees that the amount determined under section 212 of the Act will be spent within 3 years of the date of the refund for reinvestment in and modernization of its steel operations through investment in modern plant and equipment, research and development, and other appropriate projects such as working capital for steel operations and programs for the retraining of steelworkers, as required by section 212(f) of the Act.

3) The Service agrees to effect a prompt release of any refund due upon the filing by the taxpayer of the election and claim for the quick release of refund.

WHEREAS, the determinations set forth above are hereby agreed to by the Service, and by the taxpayer, including its successors and assigns.

NOW THIS CLOSING AGREEMENT WITNESSETH, that the taxpayer and Commissioner of Internal Revenue hereby mutually agree that the determinations set forth above shall be final and conclusive, subject, however, to reopening in the event of fraud, malfeasance, or misrepresentation of material fact; furthermore, no change or modification of applicable statutes will render this agreement ineffective with respect to the terms agreed to herein.

IN WITNESS WHEREOF, the above parties have subscribed their names to these presents, in triplicate.

Signed this 9th day of March, 1988.

/s/ Larry L. Symons
By Larry L. Symons
Vice President—Finance &
Treasurer
(Title)
Commissioner of Internal Revenue
By [Signature]
Assistant Commissioner
(Examination)
(Title)
Date Mar. 11, 1988