[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 28, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-16938

_____

D. C. Docket No. 03-00315-CV-T-23EAJ


EMERY ELLINGER, III,
BURCHIE C. ELLINGER,

                                                          Plaintiffs-Appellants,


versus


UNITED STATES OF AMERICA,

                                                          Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(November 28, 2006)**

Before BIRCH, PRYOR and FAY, Circuit Judges.

BIRCH, Circuit Judge:

In this appeal, we must decide whether certain monetary transfers from one Internal Revenue Code Subchapter S ("S") corporation to two other S corporations constituted *bona fide* loans, and, if so, whether those loans were effectively discharged, thereby resulting in cancellation of indebtedness income to the borrower corporations and their shareholder, Emery Ellinger, III ("Ellinger").[1] The district court concluded that the distributions at issue were not true loans and that, therefore, Ellinger, as a shareholder in the borrower S corporations, could not claim cancellation of indebtedness income to adjust his basis on his income tax return. Accordingly, the district court granted summary judgment to the Internal Revenue Service ("IRS"). Ellinger challenges that decision and argues on appeal that there is sufficient evidence to show that the monetary transfers constituted *bona fide* loans and that they were effectively discharged. Because we conclude that Ellinger has failed to show the existence of a debt, we AFFIRM the district court's order.

## I. BACKGROUND

Ellinger was the owner of a fifty-percent interest in three distinct, closely

---

[1] Emery Ellinger's wife, Burchie, is a plaintiff-appellant in this case. However, she is named as a party only because she filed joint tax returns with her husband for the years at issue. She is not a shareholder in the S corporations, nor did she participate in the monetary transactions discussed in this case. Because our opinion focuses on the actions and contentions of Emery Ellinger, we will refer to the appellants as "Ellinger."

held corporations:  Aberdeen Marketing, Inc. ("Aberdeen"), GlobalTel, Inc.

("GlobalTel"), and ProMail, Inc. ("ProMail").  Each of these corporations

previously had elected to be taxed as S corporations.[2]  In 1995, Aberdeen made

monetary transfers of $78,659 to GlobalTel and $469,916 to ProMail.  In its

corporate accounting records, Aberdeen initially characterized these transfers as

creating debt obligations owed by GlobalTel and ProMail.

At the end of 1995, Aberdeen made year-end adjustments to its books and

recharacterized these transfers as distributions to Aberdeen's shareholder (i.e.

---

[2] Subchapter S of the Internal Revenue Code ("the Code"), 26 U.S.C. §§ 1361-1379, permits qualifying corporations to avoid taxation at the corporate level by electing a system of taxation whereby the company's income is taxed directly to the corporation's shareholders, on a pro rata basis.  26 U.S.C. § 1366.  Under this "pass-through" system of taxation, which is akin to the Chapter K regime governing the taxation of partnerships, the income, losses, deductions and credits of the S corporation are itemized on the individual tax returns of the company's shareholders. Id.; Bufferd v. Comm'r, 506 U.S. 523, 525, 113 S. Ct. 927, 928-29 (1993).

The shareholder of an S corporation is permitted to increase his basis in the stock of the corporation by "items of income" that are identified in § 1366(a)(1)(A).  § 1367(a)(1). Corporate losses and deductions are also passed through to the shareholder, and the shareholder's basis in the stock is decreased accordingly.  § 1367(a)(2); Gitlitz v. Comm'r, 531 U.S. 206, 209, 121 S. Ct. 701, 704 (2001).

The shareholder, however, cannot take corporate losses and deductions into account on his personal tax return to the extent that such items exceed his basis in the stock.  § 1366(d)(1). Rather, under the special provisions of §§ 1366 and 1367 of the Code, if the corporate losses and deductions exceed the basis, "the excess is 'suspended' until the shareholder's basis becomes large enough to permit the deduction."  Gitlitz, 531 U.S. at 210, 121 S. Ct. at 704.  This suspended loss carries over indefinitely– that is, beyond the immediate year for which the tax return was filed. § 1366(d)(2).  Thus, the shareholder of an S corporation must first seek to "restore" his basis by claiming an increased basis, § 1367(b)(2)(B), before he will be entitled to deduct corporate losses, including suspended losses from previous years, on his tax individual return.  See Gitlitz, 531 U.S. at 210, 212 S. Ct. at 705.

3

Ellinger) and as capital contributions to GlobalTel and ProMail.[3]  The "IRS"

audited Ellinger's 1995 tax return and took issue with the characterization of the

transfers as capital contributions to GlobalTel and Promail.  Because the IRS

contended that the transfers constituted debts owed from GlobalTel and ProMail to

Aberdeen, the IRS asserted that Ellinger was not entitled to rely on the putative

capital contributions to increase his basis in the GlobalTel and ProMail shares.

Accordingly, the IRS disallowed Ellinger's attempted deductions on his 1995

return.

Ellinger disputed the IRS's position concerning his 1995 tax return and filed

an appeal with the United States Tax Court.[4]  Ellinger subsequently settled the

dispute with the IRS, with the two parties entering into a series of closing

agreements in settlement of that case.[5]  In the closing agreement between the IRS

and Aberdeen, the parties agreed that the year-end readjustment of the transfers

_____

[3] The shareholder of an S corporation is entitled to increase his basis in light of capital contributions that he makes to the S corporation.  See Sleiman v. Comm'r, 187 F.3d 1352, 1356 (11th Cir. 1999).  Although the record does not shed much light on the justification for this year-end tax adjustment, it appears that Ellinger recharacterized the transfers as capital contributions from him to GlobalTel and ProMail so that he could rely upon them to increase his cost basis in those companies.  By using the claimed capital contributions to increase his cost basis, Ellinger could then utilize GlobalTel and ProMail's losses and deductions, and thus would be entitled to claim deductions on his individual tax return for 1995.

[4] Emery Ellinger, III & Burchie C. Ellinger v. Comm'r, No. 012822-98 (T.C. 1998).

[5] A closing agreement is a written agreement entered into between "any person" and the IRS "relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period."  26 U.S.C. § 7121(a).

4

from Aberdeen to GlobalTel and ProMail would be disregarded. Moreover, Aberdeen and the IRS agreed that

> advances made by the taxpayer [Aberdeen] to GlobalTel in the amount of $78,659 and to ProMail in the amount of $469,916 *constitute[d] genuine indebtedness* owed by GlobalTel and ProMail to the taxpayer [Aberdeen] as of December 31, 1995.

R1-14, Ex. A at 2 (emphasis added).

The IRS entered into separate written agreements with GlobalTel and ProMail, respectively. In each of these closing agreements, the parties similarly agreed that the year-end recharacterization of the transfers from Aberdeen would be disregarded. Contrary to the Aberdeen closing agreement, however, the closing agreements with GlobalTel and ProMail failed to refer explicitly to the transfers from Aberdeen as "genuine indebtedness." Rather, each of these closing agreements stated:

> None of the amount of [funds] advanced by Aberdeen to [either GlobalTel or ProMail] in 1995 is attributable to loans from, or paid in capital contributed by, [either GlobalTel or ProMail]'s shareholders for purposes of determining shareholder basis under I.R.C. section 1367.

Id., Ex. A at 2, Ex. B at 2. Each of the closing agreements indicated that they were "final and conclusive" in nature and that each was "subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions." See id., Ex. A at 3, Ex. B at 3, Ex. C at 3.

5

Two additional developments occurred that are germane to Ellinger's appeal. First, in 1996, Aberdeen acquired all of the assets of GlobalTel and ProMail, as well as all of the third party debts of those entities.[6] In the wake of the acquisition, Aberdeen absorbed GlobalTel and ProMail into its operations; GlobalTel and ProMail ceased to exist as independent entities. As to the transfers that Aberdeen had made in 1995 to GlobalTel and ProMail, Aberdeen "wrote off" those debts from its corporate books. See R1-14, Ex. D, at 14, 16, 40, 42, 44.

The second significant development in this case occurred in 2001, when the Supreme Court decided Gitlitz v. Commissioner, 531 U.S. 206, 121 S. Ct. 701 (2001). In Gitlitz, the Supreme Court held that cancellation of debt income ("COD income")[7] constitutes an "item of income" under section 1366 of the Code. 531

---

[6] There are no acquisition documents that evince this transaction between Aberdeen and GlobalTel and ProMail. The acquisition of the companies by Aberdeen appears to have been informal in nature. Despite the lack of documentation, however, Ellinger repeatedly has asserted that, sometime in 1996, GlobalTel and ProMail were "sucked" into Aberdeen's operations. R1-14, Ex. D at 48; see also id. at 46, 49. Moreover, the IRS does not dispute the fact that the acquisition of the two companies occurred; it disputes only the legal consequences that flow from that acquisition.

[7] Cancellation of debt income, often referred to as "COD income," is a term that is interchangeable with income arising from a "discharge of indebtedness." See Alpert v. United States, 430 F. Supp. 2d 682, 685 n.1 (N.D. Ohio 2006). For tax purposes, a discharge of indebtedness is considered to be "gross income." See 26 U.S.C. § 61(a)(12). Simply put, when a taxpayer owes a debt that is later discharged or released, the taxpayer is viewed as having "realized an accession to income." Alpert, 430 F. Supp. 2d at 685, n.1. "Forgiveness of debt is income because it frees up assets that the taxpayer previously had to dedicate toward repaying its obligations." Pugh v. Comm'r, 213 F.3d 1324, 1326-27 (11th Cir. 2000) (citations omitted).

U.S. at 212, 121 S. Ct. at 706. As such, the Court held that COD income passes through to the shareholder of an S corporation. Id. Moreover, the Court held that COD income, like any other "item of income" in § 1367(a)(1), could be relied upon to increase the shareholder's basis in the stock of the S corporation. Id.; see also Pugh, 213 F. 3d at 1330 (stating that the language of section 1367 "requires that [the shareholder]'s basis be increased by the amount of COD income that passed through to him from [the S corporation]").

In the wake of Gitlitz, Ellinger filed an amended tax return for the tax year 1996, wherein he claimed additional net operating losses attributable to GlobalTel and ProMail. Ellinger claimed an increase in the basis of his GlobalTel and ProMail stock as a result of the COD income that was realized when Aberdeen acquired those two companies and canceled their debts in 1996. Because the COD income led to an increase in the basis of Ellinger's stock in GlobalTel and ProMail, Ellinger also sought to claim certain suspended losses and carry them back for two previous tax years, 1994 and 1995. Accordingly, Ellinger filed amended tax returns for 1994 and 1995 and sought refunds in the amount of $1,146 and $111,596, respectively. When the IRS denied Ellinger's claim, Ellinger filed a complaint in the district court seeking a refund of the amounts specified on his amended tax returns.

Both parties moved for summary judgment. Ellinger's motion hinged on the language of the closing agreements that the IRS had entered into in 1995, in settlement of the prior Tax Court litigation. Ellinger contended that the language in the closing agreement between the IRS and Aberdeen, in which the transfers from Aberdeen to GlobalTel and ProMail expressly were characterized as "genuine indebtedness," R1-14, Ex. A at 2, "conclusively established" that the transfers at issue were to be viewed as debts by the companies. R1-15 at 2. Ellinger further argued that Aberdeen's writing off of the debt of GlobalTel and ProMail in 1996, in the course of acquiring those companies, effectuated a cancellation of the debt, thereby resulting in COD income to GlobalTel and ProMail. Accordingly, Ellinger contended that he was entitled to increase his basis in his GlobalTel and ProMail stock, thereby taking advantage of suspended losses on his tax returns.

The IRS's motion conceded that Ellinger would be entitled to a refund under Gitlitz if he could prove that GlobalTel and ProMail realized actual COD income in 1996. The IRS contended, however, that there was insufficient evidence to show that the transfers from Aberdeen to GlobalTel and ProMail constituted *bona fide* debts. Furthermore, the IRS argued that there was no evidence that Aberdeen ever canceled the debt. Because there was no debt and because there was no discharge of debt, the IRS argued, GlobalTel and ProMail never received COD

8

income, and, consequently, Ellinger could not seek to pass through the COD income to increase his basis.

The IRS also took issue with Ellinger's reliance on the 1995 closing agreement to establish a genuine debt between Aberdeen and GlobalTel and ProMail. The IRS maintained that the closing agreement with Aberdeen established that the transfer constituted a genuine debt on Aberdeen's books *as between the IRS and Aberdeen*, but noted that in this case Ellinger was seeking an increase in his basis as a shareholder of GlobalTel and ProMail. The IRS pointed out that the GlobalTel and ProMail agreements were devoid of any language characterizing the transfers as genuine debt. Consequently, the IRS contended that the GlobalTel and ProMail agreements, standing alone, failed to establish that the Aberdeen transfers were debt obligations. Instead, the IRS asserted that the language of those two closing agreements evinced only an intent to "agree to disagree" as to the categorization of the transfers from Aberdeen. R1-14 at 7.

The summary judgment motions were referred to a magistrate judge, who reviewed the parties' arguments and prepared a report and recommendation for the district court. In her report, the magistrate judge first observed that the transfers from Aberdeen to GlobalTel and ProMail lacked any indicia of *bona fide* indebtedness. Applying the multi-factor analysis that we set forth in Lane v.

9

United States, 742 F.2d 1311, 1314-15 (11th Cir. 1984), the magistrate judge concluded that there was no objective evidence to support Ellinger's contention that the transfers were debts; rather, she concluded that the transfers were more likely intended to be capital contributions to GlobalTel and ProMail.

Secondly, the magistrate judge's report agreed with the IRS's position that the closing agreements were intended to be read separately, as individual contracts. Therefore, the magistrate judge found that there was no language in the closing agreements between the IRS and GlobalTel and ProMail to support Ellinger's characterization of the transfers as debts. Although there was indeed evidence of a debt in the Aberdeen closing agreement, the magistrate judge concluded that this separate agreement with Aberdeen "[did] not relate to the tax liabilities of GlobalTel, ProMail, or the shareholders of these two companies." R1-31 at 19. Moreover, because the language of the GlobalTel and ProMail agreements was clear and unambiguous, the report indicated that it would be improper to consider evidence that went beyond the four corners of the agreement, such as the language of the agreement with Aberdeen.

As a final matter, even assuming that the transfers from Aberdeen to GlobalTel and ProMail constituted genuine debt, the magistrate judge concluded that there was insufficient evidence to show that an effective discharge of the debt

10

had occurred, thereby resulting in COD income for GlobalTel and ProMail.  The district court adopted the report and recommendation of the magistrate judge in its entirety and granted summary judgment to the IRS.  This appeal followed.

## II.  DISCUSSION

Ellinger argues on appeal that the district court erred in granting summary judgment to the government.  "We review a district court's grant of summary judgment under a *de novo* standard of review."  Gibson v. RTC, 51 F.3d 1016, 1020 (11th Cir. 1995).  In doing so, we apply the same legal standards as those that controlled the district court.  Real Estate Financing v. RTC, 950 F.2d 1540, 1543 (11th Cir. 1992).  According to those standards, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  In this particular case, the parties have conceded that no issues of fact are in dispute; rather, the parties' disagreement centers on the legal consequences that flow from the facts of this case.  Because there are no disputed factual issues, our review involves a determination as to whether the district court's conclusions were proper as a matter of law.  See Owens v. Storehouse, Inc., 984 F.2d 394, 397 (11th Cir. 1993).

Ellinger's argument on appeal is two-fold.  First, Ellinger argues that the

11

transfers made from Aberdeen to GlobalTel and ProMail did constitute *bona fide* debt, and that there is sufficient evidence to support that characterization. Ellinger's second contention flows from the first: he argues that a valid discharge of the putative debt occurred when Aberdeen acquired GlobalTel and ProMail and wrote off the debt on Aberdeen's corporate books, thereby creating COD income for GlobalTel and ProMail. Because we do not accept the first of Ellinger's contentions, we need not address the second.

A.    Whether the Transfers from Aberdeen Constituted Actual Debts

"Debt for Federal income tax purposes connotes an existing, unconditional, and legally enforceable obligation to repay." Hubert Enter., Inc. & Subsidiaries v. Comm'r, 125 T.C. 72, 91 (2005). The IRS regulations governing the "bad debt deduction" define a *bona fide* debt as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." 26 C.F.R. § 1.166-1(c). A capital contribution or a gift is not a debt. See id. Courts, in reviewing a monetary transaction to determine whether it constitutes a *bona fide* debt, must review closely the "objective facts" of the transaction, Roth Steel Tube Co. v. Comm'r, 800 F.2d 625, 630 (6th Cir. 1986), rather than whatever characterization that the taxpayer subsequently chooses to ascribe to it. We have held that "taxpayers are liable for the tax

12

consequences of the transaction they actually execute." Selfe v. United States, 778 F.2d 769, 773 (11th Cir. 1985). That is, taxpayers "are bound by the 'form' of their transaction and may not argue that the 'substance' of their transaction triggers different tax consequences." Id.

The burden of showing that a monetary transfer is a *bona fide* debt is on the taxpayer. Hubert, 125 T.C. at 91 (citing Roth Steel, 800 F.2d at 630). This burden is "a difficult one to meet," especially when the "transaction is cast in sufficiently ambiguous terms to permit an argument either way depending on which is subsequently advantageous from a tax point of view." Estate of Leavitt v. Comm'r, 875 F.2d 420, 424 (4th Cir. 1989).

In Lane, we established a multi-factor test to aid courts in determining whether transfers to a corporation constitute debt or equity. 742 F.2d at 1314. Although Lane involved the question of whether a transfer constituted a debt for purposes of the bad debt deduction under 26 U.S.C. § 166, the Lane test has been applied subsequently in a number of cases in this circuit to determine whether a particular monetary transfer constituted a debt. See, e.g., Selfe, 778 F.2d at 773; In re Hillsborough Holdings Corp., 176 B.R. 223, 248 (Bankr. M.D. Fla. 1994). The thirteen Lane factors that should be considered in determining whether a transfer is a *bona fide* debt are:

(1) the names given to the certificates evidencing the indebtedness;
(2) the presence or absence of a fixed maturity date;
(3) the source of payments;
(4) the right to enforce payment of principal and interest;
(5) participation in management flowing as a result;
(6) the status of the contribution in relation to regular corporate creditors;
(7) the intent of the parties;
(8) 'thin' or adequate capitalization;
(9) identity of interest between creditor and stockholder;
(10) source of interest payments;
(11) the ability of the corporation to obtain loans from outside lending institutions;
(12) the extent to which the advance was used to acquire capital assets; and
(13) the failure of the debtor to repay on the due date or to seek a postponement.

742 F.2d at 1314-1315. We made clear in Lane that these factors are not rigid rules but are rather helpful guidelines to be considered and weighed by the court. Id. at 1315. Additionally, a court is not bound to consider all thirteen of the Lane factors; it needs to weigh only those factors that are relevant to the particular transaction. Id.

In expressly adopting the magistrate judge's report and recommendation, the district court in this case applied the Lane factors that it deemed were germane to Ellinger's case and concluded that the transfers paid from Aberdeen to GlobalTel and ProMail did not constitute *bona fide* debts. The court noted that there were no promissory notes executed in connection with the transfer of funds and that

14

Ellinger could not recall if there was any interest rate agreed upon in connection with the transaction. The court also observed that the funds transferred to GlobalTel and ProMail were not secured by any collateral, nor were any of the funds transferred by Aberdeen ever repaid. In light of these findings, as well as the general lack of formalities attendant to the transactions, the district court concluded that the transfers in question did not constitute *bona fide* debts as a matter of law.[8] In the absence of a valid debt running from Aberdeen to GlobalTel and ProMail, the district court reasoned that Ellinger could not rely upon COD income to increase his cost basis in his shares of GlobalTel and ProMail. Accordingly, the district court granted summary judgment to the IRS.

We conclude that the district court's decision was fundamentally sound. Applying our analysis in Lane, it is clear that the transfers from Aberdeen to GlobalTel and ProMail lacked the traditional indicia of debt. There were no promissory notes evidencing indebtedness on the part of GlobalTel and ProMail. There was no evidence presented to show that the purported loan had a fixed

---

[8] In adopting the magistrate judge's report and recommendation, the district court also implicitly adopted the magistrate judge's conclusion that these transfers more likely "constitute[d] contributions to capital rather than debt." R1-31 at 14. That determination, however, was unnecessary to the disposition of Ellinger's case. The burden is on the taxpayer to show the existence of a debt. Roth Steel, 800 F.2d at 630; Hubert, 125 T.C. at 91. Because we conclude that Ellinger failed to satisfy his burden of showing the existence of a debt as a matter of law, we need not speculate as to the proper categorization of the transaction (i.e. as a capital contribution, or otherwise). We find that there is insufficient evidence of a *bona fide* debt.

15

maturity date, which we have previously held is a "highly significant feature of a debtor-creditor relationship." Sinnett's Pontiac Serv., Inc. v. Comm'r, 730 F.2d 634, 638 (11th Cir. 1984). Ellinger asserted in his deposition testimony that efforts were made to collect the putative debt from GlobalTel and ProMail, but he presented no documentary evidence to show that Aberdeen ever actively attempted to recover the funds that it transferred. Although Ellinger testified that ProMail's comptroller "tried to get the money, cash flow . . . when they had it, try to pay that back," R1-14, Ex. D at 29, Ellinger failed to demonstrate a "right to enforce payment of principal and interest" by showing either a specific protocol for enforcing the loan in the event of a default, or, failing that, a mutually agreed repayment schedule. See Lane, 742 F.2d at 1314.

Moreover, Ellinger's evidence as to the parties' intent was based solely on his contention that Aberdeen, GlobalTel, and ProMail agreed at the outset that the transfers would be considered loan obligations. Yet we have instructed that courts must look beyond the "self-serving declarations of the parties" and examine "the objective facts to determine whether the parties intended the advances to constitute debt." Id. at 1316 (citation omitted). One fundamental indicator suggesting an intent to create a loan is the presence of an interest rate; as our predecessor circuit has held, "a true lender is concerned with interest." Curry v. United States, 396

16

F.2d 630, 634 (5th Cir. 1968).

Ellinger stated in his deposition that he did not recall whether the transfers contained a provision for the payment of interest. During oral argument, his attorney acknowledged that no interest rate was charged in connection with these transfers. The fact that Aberdeen would transfer a total of $548,575 to two fledgling, unprofitable companies without any interest rate provisions, and without any collateral to secure repayment, belies Ellinger's self-serving assertion that the distributions were true, enforceable debts. Rather, the objective facts of the transaction do not evince an intent to create a debt between the companies.

We also made clear in Lane that in order for a monetary transfer to be construed as a valid debt, the expectation of repayment must not "depend solely on the success of the borrower's business." Lane, 742 F.2d at 1314. In Lane, the taxpayer asserting the existence of a loan indicated that he would demand repayment from the borrower corporations when "it was good for [their] business." Id. at 1316. We held that where "repayment was in some way tied to the fortunes of the business," it was unlikely to be a *bona fide* loan to a borrower corporation. Id. (citation omitted). In this case, Ellinger similarly testified that Aberdeen expected to be repaid when GlobalTel and ProMail's businesses were successfully "fix[ed]" and started turning a profit. R1-14, Ex. D at 28-29. Ellinger further

17

testified that once GlobalTel and ProMail had a positive cash flow, he would seek to be repaid.  Id.  These statements suggest that Ellinger (and, implicitly, his controlled corporation, Aberdeen) expected to be repaid by GlobalTel and ProMail if and when those companies became profitable and repayment became feasible. Under our analysis in Lane, such evidence militates against finding the transfers to be true debts.

B.    The Effect of the IRS Closing Agreements

To circumvent the obvious impact of Lane on his case, Ellinger argues that "[t]he traditional indicia of bona fide indebtedness became irrelevant when the government and the parties executed the closing agreements."  Appellant's Br. at 15.  Specifically, Ellinger asserts that the closing agreement entered into between the IRS and Aberdeen, in settlement of the prior Tax Court litigation, explicitly stated that the "advances made by [Aberdeen] to GlobalTel . . . constitute[d] genuine indebtedness owed by GlobalTel and ProMail to [Aberdeen].  R1-14, Ex. A at 2.  Ellinger construes this provision as a quasi-admission by the IRS that the transfers in question were to be viewed as debt; he contends that, because the provision in the Aberdeen closing agreement conclusively binds the IRS to the view that the transfers were debts, the IRS should not be permitted to take a

18

different position in characterizing the transfers.[9]

Ellinger's appeal hinges on the language of the Aberdeen closing agreement.

In effect, he has conceded that the only evidence he has to show the existence of a

*bona fide* debt is the language of that document.  The problem with Ellinger's

argument, however, is that the reference to the transfers as debts only appears in

the closing agreement between the IRS and Aberdeen; the closing agreements

between the IRS and GlobalTel and ProMail, on the other hand, are devoid of any

such language.[10]

---

[9] Although his brief alludes to an estoppel argument, Ellinger does not expressly argue that the IRS should be estopped from denying that the distributions in question are loans.  This is presumably because the burden of establishing an equitable estoppel claim against the government is so daunting.  See, e.g., Feldman v. Comm'r, 20 F.3d 1128, 1134 (11th Cir. 1994) (citations omitted) (stating that "equitable estoppel will lie against the government only in the most extreme circumstances" and that "the burden on the private party seeking to estop the government is heavy"); Bokum v. Comm'r, 992 F.2d 1136, 1141 (11th Cir. 1993) ("Equitable estoppel claims lodged against the government are of a different ilk from those asserted against a private party.").  Nonetheless, an estoppel claim would not likely succeed on these facts, because there is no evidence of any fraudulent misrepresentation, or any negligent or willful conduct, on the part of the IRS in entering into the closing agreement with Aberdeen.  See Feldman, 20 F.3d at 1134.

[10] More pointedly, the GlobalTel and ProMail agreements state that none of the transfers by Aberdeen to GlobalTel or ProMail "is attributable to loans from, or paid in capital contributed by, [either GlobalTel or Promail]'s shareholders for purposes of determining shareholder basis under I.R.C. section 1367." R1-14, Ex. B at 2.  Because a shareholder may readjust his basis based on amounts that he loans an S corporation, Selfe, 778 F.2d at 770 (citing IRC § 1374), and since a shareholder may increase his basis based on capital contributions that he makes to an S corporation, Sleiman, 187 F.3d at 1356, the IRS apparently included this provision in the closing agreements with GlobalTel and ProMail to preclude Ellinger from seeking to adjust his basis in those two corporations.  In other words, in settling its dispute with Ellinger, the IRS sought to ensure that Ellinger would not seek to adjust his basis in either GlobalTel or ProMail as a shareholder in those entities, at least on the basis of those settlement agreements.

19

Section 7121 of the Code authorizes the Secretary of the Treasury to enter into written settlement agreements with "any person relating to the liability of such person. . . in respect of any internal revenue tax for any taxable period." 26 U.S.C. § 7121(a). Such agreements are deemed to be "final and conclusive," and "shall not be reopened as to the matters agreed upon." § 7121(b). In turn, "[t]reasury regulations authorize the Commissioner [of Internal Revenue] to enter into written closing agreements relating to a person's tax liability and give these agreements final and conclusive effect." Crowell v. IRS, 305 F.3d 474, 476 (6th Cir. 2002) (citing 26 C.F.R. § 301.7121-1(a), (c)).

Closing agreements are "contracts in the ordinary legal sense of the term," and, as such, they are "governed by . . . federal common law contract principles." United States v. Nat'l Steel Corp., 75 F.3d 1146, 1150 (7th Cir. 1996). Consequently, they are interpreted under general principles of contract law and are binding on the parties who enter into them. Id. See also Philips v. Comm'r, 178 F.2d 270, 271 (3d Cir. 1949) (per curiam) (declining to enforce a closing agreement where the plaintiffs were "strangers to [the] agreement," and stating that they could neither be "bound by it nor [could] they take advantage" of it).

Moreover, we have stated that IRS closing agreements are exclusive and are to be strictly construed. Klein v. Comm'r, 899 F.2d 1149, 1152 (11th Cir. 1990).

20

That is, "only matters specifically spelled out in a closing agreement as being resolved will be treated as settled." Geringer v. Comm'r, 61 T.C.M. (CCH) 1738, at *8 (Jan. 28, 1991) (citing Zaentz v. Comm'r, 90 T.C. 753, 766 (1990)). "Premises underlying the agreement," or premises "not specifically noted as settled, are not binding on the parties to the agreement." Id.

Ellinger is seeking to pass-through the claimed COD income *based upon his position as a shareholder in GlobalTel and ProMail*, not as a shareholder in Aberdeen. In reviewing the GlobalTel and ProMail closing agreements, however, those two documents are silent as to whether the transfers from Aberdeen constituted "genuine indebtedness." Indeed, they fail to take any clear position as to how the transfers should be viewed.[11] These two contractual agreements, standing alone, do not indicate that the parties to them (the IRS, GlobalTel, and

_____

[11] As a matter of tax law, the parties have agreed that the monetary transfers to GlobalTel and ProMail can be considered only one of three things: a gift, a capital contribution, or a loan. See, e.g., 26 C.F.R. § 1.166-1. Both parties have conceded that the transfers did not constitute a gift. Nor were the transfers capital contributions, since the closing agreements with GlobalTel and ProMail expressly sought to preclude the transfers from being characterized as capital contributions. When asked how it would categorize the transfers at oral argument, the IRS stated that the question posed a "metaphysical" mystery. Ellinger argues that, if the monetary transfers were not a gift, and they were not capital contributions, then, a fortiori, they must have been loans. See R1-14, Ex. D at 39. While this garners the resourceful-argument-of-the-session award, it is unnecessary for us to decide how best to categorize the monetary transfers. We accept the government's contention that the closing documents between the IRS and GlobalTel and ProMail purposefully are unclear as to what the transfers were, and that the agreements reflect an intent to "agree to disagree" about how to characterize the transfers. R1-14 at 7. Moreover, regardless of how the distributions should be categorized, it is sufficient to hold that Ellinger has not met his burden of showing that they were *bona fide* debts.

ProMail) expressly agreed to treat the transfers as *bona fide* debts. There is no evidence that the nature of the transfers was ever "specifically noted as settled" between the parties to the two agreements. See id. In examining the agreements between the IRS, GlobalTel, and ProMail according to general principles of contract interpretation, we can conclude only that the transfers were viewed by the parties, rather open-endedly, as transactions. On their face, the closing agreements do not settle conclusively that the transfers to GlobalTel and ProMail constituted genuine debts.

It is true, as Ellinger contends, that the closing agreement between Aberdeen and the IRS described the transfers as "genuine indebtedness," R1-14, Ex. A at 2, but that agreement only binds the parties to that agreement, Aberdeen and the IRS. As the district court correctly observed, "[t]he closing agreement signed by Aberdeen . . . does not relate to the tax liabilities of GlobalTel, ProMail, or the shareholders of those two companies." R1-31 at 19. It bears reiterating that Ellinger's tax refund claim is based upon his standing as a shareholder in GlobalTel and ProMail, not his standing as a shareholder in Aberdeen, and the contractual language of the agreements between those two corporations and the IRS fails to prove the existence of a debt. We agree with the decisions of the Tax Court holding that courts should avoid "includ[ing] as part of the [GlobalTel and

22

ProMail] agreement[s] matters other than the matters specifically agreed upon and mentioned in the closing agreement." Zaentz, 90 T.C. at 766.

Ellinger contends that the GlobalTel and ProMail closing agreements must be construed contextually; he seeks to interpret those agreements alongside the more explicit language of the Aberdeen agreement. In effect, Ellinger would have us view the GlobalTel and ProMail closing agreements as partially integrated contracts. "[I]f a document is determined to be [] partially integrat[ed], then prior or contemporaneous oral or written agreements can be incorporated provided they do not contradict a term of the existing writing." Marathon Oil Co. v. United States, 42 Fed. Cl. 267, 275 (1998). Essentially, Ellinger seeks to take the separate reference to "genuine indebtedness" in the Aberdeen agreement and to incorporate it into the GlobalTel and ProMail agreements. R1-14, Ex. A at 2.

However, the agreements with GlobalTel and ProMail are fully integrated; they expressly state that they are "final and conclusive" and that their provisions are to be given full effect. R1-14, Ex. B at 3, Ex. C at 3. While the GlobalTel and ProMail agreements do not define the Aberdeen transfers, they are conclusive in settling the issue of tax liability among the IRS, GlobalTel, and ProMail. Indeed, "the terms of the closing agreements state quite clearly what the matters agreed upon are." See Marathon Oil, 42 Fed. Cl. at 275. We find no grounds to view

23

them as partially integrated or in need of supplemental, extrinsic evidence. Accordingly, Ellinger's attempt to incorporate the reference to "genuine indebtedness" in the Aberdeen agreement into the GlobalTel and ProMail agreements is unavailing.

Nor can Ellinger prevail on his argument that the closing agreements contain lurking ambiguities. While it is hornbook contract law that a court "may rely on parol evidence to explain or clarify an ambiguity" in a contract, Marathon Oil, 42 Fed. Cl. at 275, where the essential terms of a contract are unambiguous the court "will not look beyond the four corners of the document to determine the parties' intent." Rink v. Comm'r, 47 F.3d 168, 171 (6th Cir. 1995). Although the agreements between the IRS, GlobalTel, and ProMail lack an express definition of the Aberdeen transfers, that fact does not make them ambiguous or vague. Indeed, the fact that the GlobalTel and ProMail contracts are of limited scope indicates that the parties intended to agree to a narrow set of premises, without resolving each and every aspect of their dispute. See, e.g., Geringer, 61 T.C.M. (CCH) 1738 at *8 ("The limited scope of the closing agreement does not make it ambiguous. The agreement is simply limited to those matters contained therein."). See also Bethlehem Steel Corp. v. United States, 270 F.3d 135, 142-144 (3d Cir. 2001) (finding that the parties to the closing agreement deliberately opted to exclude

24

certain issues from the contract, and concluding that "[i]n light of the Agreement's self-consciously limited scope, its silence regarding these matters unambiguously demonstrates that they were simply not terms agreed upon by the parties"). Therefore, we do not conclude that the GlobalTel and ProMail closing agreements are ambiguous or unclear.

Finally, Ellinger cites to a written Appeals Memorandum that was prepared by the IRS prior to the settlement of the Tax Court litigation between Ellinger and the IRS, concerning his 1995 readjustment of the Aberdeen transfers. In the course of that settlement memorandum, which was prepared prior to the execution of the closing agreements, the IRS stated that GlobalTel and ProMail had agreed that "the advances would be treated as loans from Aberdeen." R1-15, Ex. A at 4. Ellinger construes this as an effective admission by the IRS that the transfers were loans. This argument is also meritless, since the language of the closing agreements with GlobalTel and ProMail is clear and fully integrated. The IRS closing agreements "would be undermined if the taxpayer could present the testimony of the IRS agents who had negotiated the agreement [to] mean [] something different from what it says." Nat'l Steel, 75 F.3d at 1150. Accordingly, we decline Ellinger's invitation to look beyond the four corners of the closing agreements with GlobalTel and ProMail. Those agreements are clear, standing alone, and they fail

25

to prove the existence of a debt.

Judge Learned Hand once mused that "there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible."[12]  In this case, Ellinger, like millions of taxpayers, made a good-faith attempt to do just that.  In pursuing his tax refund, however, Ellinger has failed to offer sufficient evidence to support his claim that there was a valid debt running from Aberdeen to GlobalTel and ProMail.  Ellinger's attempts to rely on a separate provision of a previously executed closing agreement with the IRS have proven futile, especially since GlobalTel and ProMail were "strangers to that agreement" and were "neither bound by it nor [could] they take advantage thereof."  Phillips, 178 F.2d at 271.  Because Ellinger cannot rely upon the closing agreements with GlobalTel and ProMail, he has been relegated to proving indebtedness according to the traditional debt-equity analysis we set forth in Lane.  Under that analysis, it is clear that there were no indicia of traditional debt in connection with this transfer.  Because there is insufficient evidence of an enforceable debt in this case, Ellinger was not entitled to claim COD income arising from a discharge of that debt.  And because we hold that Ellinger has failed at the outset to establish the existence of a *bona fide* debt, we need not reach his second contention that the claimed debt was later

---

[12] Comm'r v. Newman, 159 F.2d 848, 850-51 (2d Cir. 1947) (Hand, J., dissenting).

26

"discharged" by Aberdeen, thereby creating COD income.

## III. CONCLUSION

Ellinger appealed the decision of the district court granting summary judgment to the IRS. Upon careful review, we conclude that the district court acted properly in finding that there was insufficient evidence of a debt that could be discharged. Consequently, Ellinger had no grounds to claim COD income to increase his cost basis in the S corporations GlobalTel and ProMail in order to claim the benefit of suspended losses from previous tax years. Accordingly, the judgment of the district court is **AFFIRMED**.