

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-1-2001

# Bethlehem Steel Corp v. USA

Precedential or Non-Precedential:

Docket 00-2901

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

## Recommended Citation

"Bethlehem Steel Corp v. USA" (2001). *2001 Decisions.* Paper 253.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/253

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 1, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2901

BETHLEHEM STEEL CORPORATION
AND AFFILIATED SUBSIDIARY COMPANIES,
        Appellant

v.

UNITED STATES OF AMERICA

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 98-cv-03417)
District Judge: Hon. J. Curtis Joyner

Argued May 31, 2001

Before: SLOVITER, FUENTES and COWEN, Circuit  Judges

(Filed: November 1, 2001)

        Melvin E. Lefkowitz (Argued)
        Hogan & Hartson
        Washington, D.C. 20004-1109

         Attorney for Appellant

        Charles Bricken (Argued)
        Richard Farber
        United States Department of Justice
        Washington, D.C. 20044

         Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

At issue in this case is the interpretation of a Closing
Agreement between the Internal Revenue Service ("IRS")
and appellant Bethlehem Steel Corporation ("Bethlehem" or
"taxpayer") that preceded the payout by the IRS to
Bethlehem of a refund of an anticipated overpayment of
taxes, subject to later audit. Resolution of the issue
depends on whether an anti-retroactivity clause in the
agreement prevents the IRS from applying retroactive
legislation, enacted after the parties' execution of the
Closing Agreement, in determining Bethlehem's tax liability.
The District Court held that the language of the clause
limits its protection to "terms" of the agreement, and that
the amount of the cash-out and the method by which it
would be calculated were not "terms" of the agreement. The
District Court therefore granted summary judgment to the
IRS. Bethlehem appeals.

II.

Under the law applicable from 1976 to 1986, domestic
manufacturers could claim tax credits based on certain
modernization investments. If not fully used in the year
earned, these credits could be "carried forward" for use in
future years. The Tax Reform Act of 1986 ("TRA")[1] repealed
the investment credit for property placed in service after
December 31, 1985, and reduced the value of unused
credits. One of various transition rules enacted in
conjunction with the repeal provided a tax benefit for
qualified domestic steel manufacturers, such as Bethlehem,
which were in dire financial straits and unlikely to generate
sufficient income to use their remaining tax credits.

_____

1. Pub. L. No. 99-514, 100 Stat. 2085 (codified as amended in scattered
sections of 26 U.S.C.).

2

Under TRA S 212, the steel manufacturers could elect to treat 50% of their unused credits ("existing carryforwards") as an income tax payment for the first taxable year after December 31, 1986, thereby enabling them to "cash out" the credits through a "refund" for overpayment of taxes. Because this benefit was intended to enable the qualified companies to modernize their operations, S 212(f) required the companies to reinvest their refunds into their businesses, although the TRA did not set a reinvestment deadline. Moreover, while the statute's definition of "existing carryforwards" included 1986 credits, see TRA S 212(g)(2), the Conference Report on the statute clearly stated Congress' intent to include credits only through 1985, see 2 H.R. Conf. Rep. No. 99-841, at 65 (1986). The House of Representatives passed a bill in 1987 that would have retroactively amended S 212 to exclude 1986 credits, but the Senate never addressed that bill.

Meanwhile, Bethlehem and other eligible steel companies (collectively, the "Steel Companies") anticipated large 1987 refunds as a result of S 212. In February and March, 1988, a committee of the Steel Companies (including Bethlehem) met with the IRS to discuss how to obtain the refunds prior to the actual filing (and auditing) of their 1987 returns. It was not unusual for steel companies to obtain extensions for filing their tax returns because of the complexity of their business affairs. The Steel Companies wanted the IRS to issue the refunds on March 15, 1988, the statutory date of their "overpayments," and there is legislative history that Senators interested in the bill intended that the cash-outs be quickly released. See 132 Cong. Rec. S8269 (1986) (statements of Sens. Heinz and Packwood). The Steel Companies initially proposed that the agency process the refunds using an expedited procedure designed to adjust overpayment of estimated income taxes. The IRS rejected this proposal, negotiating to ensure that it had time to audit the refunds and that the Steel Companies complied with S 212's reinvestment mandate. In return for concessions in these areas, the IRS agreed to issue the refunds promptly upon receipt of the Steel Companies' claims. To memorialize the parties' agreement, the IRS drafted a "Closing Agreement on Final Determination

3

Covering Specific Matters" ("Closing Agreement") without significant input from the Steel Companies.

On March 9 and 11, 1988, respectively, Bethlehem and the IRS signed the Closing Agreement. It provided:

> WHEREAS, [Bethlehem ] anticipates an overpayment of its federal income tax liability for its [1987] taxable year . . . resulting from the application of [S] 212 of the [TRA] and desires a quick release by the [IRS] of any such overpayment; and
>
> WHEREAS, [Bethlehem ] may be unable to file its federal income tax return for [1987] . . . by its due date determined without regard to any time to file extension.
>
> NOW IT IS HEREBY DETERMINED AND AGREED for federal income tax purposes that:
>
> 1) [Bethlehem ] agrees that the period of limitations for the [IRS] to bring suit to recover any amount of such overpayment claimed by [Bethlehem ] that is determined to be erroneous or excessive shall not expire prior to the expiration of the period of limitations on assessment of tax . . . with respect to [Bethlehem's] federal income tax return for [1987] . . . .
>
> 2) [Bethlehem ] agrees that the amount determined under [S] 212 of the [TRA] will be spent within 3 years of the date of the refund for reinvestment in and modernization of its steel operations through investment in modern plant and equipment, research and development, and other appropriate projects . . ., as required by [S] 212(f) of the [TRA].
>
> 3) The [IRS] agrees to effect a prompt release of any refund due upon the filing by [Bethlehem ] of the election and claim for the quick release of refund.
>
> WHEREAS, the determinations set forth above are hereby agreed to by the [IRS], and by [Bethlehem ], including its successors and assigns.

4

> NOW THIS CLOSING AGREEMENT WITNESSETH,
> that [Bethlehem ] and [the IRS] hereby mutually agree
> that the determinations set forth above shall be final
> and conclusive, subject, however, to reopening in the
> event of fraud, malfeasance, or misrepresentation of
> material fact; furthermore, no change or modification of
> applicable statutes will render this agreement ineffective
> with respect to the terms agreed to herein.

App. at 30-31 (emphasis added). It is conceded that the "anti-retroactivity" clause, underlined above,"was never an issue" in the IRS-Steel Companies meetings. App. at 126.

The IRS also drafted, again without significant input from the Steel Companies, an "Election and Claim for Quick Release of Overpayment Resulting from the Application of Section 212 of the Tax Reform Act" of 1986 ("Claim Form"), which the Steel Companies were to use to request their refunds. App. at 36. The Claim Form referred to"the election required under [TRA S] 212," allowed the electing company to specify the percentage of "existing carryforwards as defined in [TRA S] 212(g)(2)" to which its election would apply, and required the company to list the carryforwards supporting its refund calculation. App. at 36-37. On March 15, 1988, Bethlehem filed its Claim Form, electing the S 212 cash-out, and claiming a $140,428,024 refund based on $280,856,047 of existing carryforwards. It explicitly included its 1986 credits in its refund calculations which it attached to the form, as required. The IRS paid the claimed refund on March 25, 1988.

Bethlehem filed its consolidated 1987 income tax return on August 8, 1988. On November 10, Congress enacted the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA").[2] TAMRA S 1002(f)(5) amended TRA S 212 to exclude 1986 credits from the definition of "existing carryforwards" used to calculate S 212 refunds, and S 1019(a) provided that this "amendment . .. shall take effect as if included in the provision of the Reform Act to which [it] relates." Consequently, upon its audit of Bethlehem's 1987 tax return, the IRS determined that the

_____

2. Pub. L. No. 100-647, 102 Stat. 3342 (codified as amended in scattered sections of 26 U.S.C.).

5

company's 1986 credits, worth $11,381,450, should not have been included in calculating the company'sS 212 refund. The IRS and Bethlehem entered into an agreement whereby the company agreed to pay the resulting deficiency of $5,690,725 plus interest, for a total of $13,397,164, but reserved its right to claim a refund based on its purported right to include 1986 credits in its S 212 refund calculations. Bethlehem paid the assessment and sought the refund, which the IRS disallowed on April 9, 1998.

III.

On July 2, 1998, Bethlehem sued the IRS to recover the refund, arguing that the Agreement's anti-retroactivity clause barred the application of TAMRA to exclude 1986 credits from the calculation of its S 212 refund. After submitting a stipulated record, the parties cross-moved for summary judgment. The District Court denied both motions, finding the Agreement ambiguous. After discovery, the parties again cross-moved for summary judgment.

On August 7, 2000, the court granted the IRS's motion and denied Bethlehem's motion. See Bethlehem Steel Corp. v. United States, 108 F. Supp. 2d 449 (E.D. Pa. 2000). After considering extrinsic evidence, it found that the Agreement's overriding purpose was to expedite Bethlehem's receipt of its refund, and that the parties negotiated and agreed to provisions providing for: (1) prompt release of the refund, (2) an extension of the IRS's statute of limitations for challenging the refund, and (3) a deadline for Bethlehem's reinvestment of the refund. Finding that neither the amount nor the method of calculating the refund were negotiated terms of the Agreement, the court held that they were not protected by the Agreement's narrow anti-retroactivity clause. Bethlehem timely filed its notice of appeal.

The District Court had jurisdiction pursuant to 28 U.S.C. SS 1331, 1346(a)(1). This court has jurisdiction pursuant to 28 U.S.C. S 1291, and conducts a plenary review of the District Court's summary judgment rulings. See Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 129 (3d Cir. 1991).

6

IV.

The IRS is authorized to enter into closing agreements which are "final and conclusive . . . except upon a showing of fraud or malfeasance, or misrepresentation of a material fact." 26 U.S.C. S 7121(b). Courts interpret closing agreements according to general federal contract law principles. See United States v. Nat'l Steel Corp., 75 F.3d 1146, 1150 (7th Cir. 1996); Rink v. Comm'r, 47 F.3d 168, 171 (6th Cir. 1995).

We determine a contract's meaning as a matter of law when its language is clear and unambiguous, see Int'l Union v. Skinner Engine Co., 188 F.3d 130, 138 (3d Cir. 1999), but may use extrinsic evidence to clarify the meaning of an ambiguous contract. See In re New Valley Corp., 89 F.3d 143, 150 (3d Cir. 1996). We have stated that "[t]o decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. . . . [W]e consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993) (citations omitted); see also In re New Valley Corp., 89 F.3d at 150.

In its discussion of the Agreement, the District Court cited the Seventh Circuit's interpretation of an identical closing agreement between the IRS and another of the Steel Companies. See Bethlehem Steel Corp., 108 F. Supp.2d at 453; Nat'l Steel, 75 F.3d at 1152. In National Steel, the court held that the purpose of the closing agreement was to expedite National Steel's receipt of its refund while protecting the IRS's interests. It further held that the anti-retroactivity clause protects only those terms decided in the agreement. Nat'l Steel, 75 F.3d at 1151. The court concluded that despite the document's references toS 212 the agreement did not specify the use of the section's then-current refund-calculation criteria, noting that"[h]ad National Steel wanted to avoid the risk of a retroactive change in law, it could have negotiated for a determination

7

that its tax liability would be calculated in accordance with existing law." Id. at 1152.

In this case, the parties do not dispute that the anti-retroactivity clause applies only to "terms" of the Agreement.3 However, the IRS claims that because, as both the District Court and the Seventh Circuit found, the S 212 refund calculation is not a term of the Agreement, the clause does not bar application of TAMRA's retroactive exclusion of 1986 credits from the calculation of Bethlehem's refund.4 Bethlehem, on the other hand, contends that because this court considers extrinsic evidence in determining whether a contract is ambiguous, we should not follow the National Steel decision which was made without the benefit of such evidence. The company asserts that the evidence in this case proves that the parties intended that Bethlehem's refund be calculated under the existing S 212, thereby making the method of calculation a term of the Agreement. Any other interpretation, the company contends, renders the Agreement's anti-retroactivity clause meaningless.

_____

3. Bethlehem does urge this court to give the anti-retroactivity clause special significance, asserting that the clause, which the IRS drafted unilaterally, varies from the agency's standard retroactivity language. See App. at 34 (Form 906, January 1987) ("This agreement is final and conclusive except: . . . if it relates to a tax period ending after the date
of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period."); see also 26 C.F.R. S 301.7121-1(c)(2) (2001) ("[A] closing agreement with respect to a taxable period ending subsequent to the date of the agreement is subject to any change in, or modification of, the law enacted subsequent to the date of the agreement and made applicable to such taxable period."); Rev. Proc. 68-16, 1968-1 C.B. 770, 796 (same).

4. National Steel also found that the requirement that closing agreements have high-level IRS approval would be undermined if courts considered the testimony of IRS negotiators to alter the agreements' language, and thus held that courts "must strive more mightily than would otherwise be the case to make sense of [such] contract[s] without ordering a[n evidentiary] hearing." Nat'l Steel, 75 F.3d at 1150. The IRS urges this court to adopt the Seventh Circuit's determination that excessive consideration of extrinsic evidence in interpreting closing agreements may undermine the statutory requirement that closing agreements be approved by a high-level IRS authority. We need not reach this issue in light of our disposition.

8

We agree with the court in National Steel that the method of refund calculation is unambiguously not a term of the Agreement and is therefore not protected by the anti-retroactivity clause. Although we agree with the IRS that there is no ambiguity, even if we were to hold that there was, we would conclude that the extrinsic evidence of record reinforces this interpretation of the Agreement's plain language.

A. The Refund-Calculation Method Is Not a Term
         of the Agreement

The Closing Agreement, which by its title is expressly limited to "[s]pecific [m]atters," App. at 30, contains only three substantive paragraphs describing terms agreed upon by the parties. Each of these provisions deals with procedures pertaining to Bethlehem's receipt and investment of its S 212 refund, and the IRS's release and auditing of the refund. None of the three purports to set an amount, or describe a calculation formula, for the refund, and these matters plainly do not constitute terms of the Agreement. Bethlehem cites the two references to S 212 in the Agreement as evidence that the section's then-current method of refund calculation, which included 1986 credits, is a term of the Agreement. However, neither of the references purports to describe the method to be used in calculating the refund.5

One reference, in the Agreement's first recital, states that Bethlehem anticipates a tax overpayment in 1987 as a result of S 212 and desires a quick release of such overpayment. This recital explains the purpose of the agreement, rather than defining a term agreed upon by the parties. It focuses on the promptness of the IRS's response to Bethlehem's anticipated refund claim rather than the size or manner of calculating the refund. The reference to

_____

5. The grammatical structure of the Closing Agreement certainly suggests that the IRS took no position in that Agreement as to the applicability of the method of calculation of the refund in S 212. Throughout the Closing Agreement it is Bethlehem, not the IRS, which is the subject of the clauses which reference S 212. The IRS retains a neutral position toward the availability of any recovery, let alone a specific amount or means of calculation.

9

S 212 merely acknowledges the statute precipitating the agreement and cannot reasonably be understood to provide for a particular method of calculating the refund.

The IRS's guideline describing the proper form for closing agreements relating to specific matters states, in relevant part:

> The identification of the parties is followed by one or more WHEREAS clauses which serve to introduce the subject matter of the agreement and state premises upon which it is based. . . .
>
> It is important to distinguish between matters which are merely informative and explanatory and matters which are being agreed upon. The former should be segregated from the latter and should ordinarily be reflected in the introductory recitals contained in the WHEREAS clauses.

Rev. Proc. 68-16, 1968-1 C.B. 770, 779.6  This guideline further supports our conclusion that the Agreement's first reference to S 212 does not incorporate the section's refund-calculation method into the contract as a matter"agreed upon" by the parties.

The second reference is in the second substantive provision of the Agreement, which provides that Bethlehem must reinvest "the amount determined under"S 212 within three years of receiving the money. The company argues that this phrase specifies the method for calculating the reinvestment amount and, therefore, the refund amount. However, the phrase is situated in a provision describing the time and manner, rather than the amount, of reinvestment, belying this interpretation. Nonetheless, Bethlehem contends that the actual effect of the reinvestment deadline in this case supports its position, stating that because it respected the three-year deadline, it reinvested its entire refund before the IRS disallowed the portion of the refund based on 1986 credits, with the result that it reinvested more than the amount of its ultimate refund.

_____

6. The three substantive paragraphs of the Agreement are structured as described in this guideline.

10

Bethlehem argues that by imposing the three-year reinvestment deadline, the IRS bound itself to use the same method to calculate the refund as the company had used to calculate the reinvestment obligation. This "overinvestment" claim is not supported in the record and does not compel Bethlehem's interpretation of the Agreement. Bethlehem points to no evidence that it reinvested more under the Agreement than it otherwise planned to invest, or that it did so before TAMRA was enacted, less than one year into the reinvestment period. Moreover, Bethlehem undertook the risk of overinvestment when it agreed to extend the IRS's period of limitations for challenging the refund past the reinvestment deadline rather than negotiating for a different timeline.

In fact, Bethlehem's overinvestment argument highlights the fact that the Agreement's first substantive provision expressly reserves the IRS's right to challenge the company's claimed refund should it be "determined to be erroneous or excessive" and extends the agency's statute of limitations for such challenges. App. at 30. Along with the final substantive provision, requiring prompt release of the claimed refund, this provision further demonstrates that the parties intended that the Agreement would facilitate Bethlehem's quick receipt of the funds while allowing the IRS ample time to audit the company's claim. It follows that there was no reason why the Agreement would contain any term detailing the anticipated refund's size or calculation. We therefore agree with the IRS that the Closing Agreement was not ambiguous and that it was entitled to summary judgment on its first motion.

B. Extrinsic Evidence Reinforces the Agreement's
        Unambiguous Meaning

Even assuming, arguendo, that either the Agreement's references to S 212 or the extrinsic evidence create an ambiguity as to whether the parties meant to incorporate a refund-calculation formula into the Agreement, consideration of the extrinsic evidence submitted with the renewed motions for summary judgment supports our reading of the document's plain language. The record demonstrates clearly that the parties never discussed, much less negotiated, the method to be used for calculating

11

the refund. In fact, there is evidence that the Steel Companies, although aware of the discrepancy between the language of the existing statute regarding 1986 credits and the intent of Congress reflected in the Conference Report, anticipated that a second technical corrections bill would be introduced in 1988. However, as part of a deliberate strategy, they did not raise the issue of whether the 1986 credits would be included in calculating their refunds during their negotiations with the IRS leading to the Closing Agreement. Donald McCambridge, Bethlehem's lead representative in the IRS-Steel Companies negotiations, later wrote:

> As background material for the negotiations, we provided the IRS with copies of both the statute and the Conference Report. The IRS never raised a question about the difference [regarding 1986 credits] and we did not feel compelled to make a special effort to call it to their attention. To this day I could not positively say that the failure to raise the issue was due to ignorance or acceptance of the fact that the statute is controlling.

App. at 161 (Letter from McCambridge to Harshman of 5/2/91).

Bethlehem points out that the Steel Companies referenced their intent to include 1986 credits in their calculations in documents they gave the IRS, and notes that the IRS did not challenge their definition of "existing carryforwards." However, this does not show that the parties reached an accord on the method of refund calculation and agreed to make it a term of their limited Agreement. In fact, the references to the 1986 credits do not even demonstrate that the Steel Companies subjectively understood their method of refund calculation to be a term of the Agreement, particularly in light of their deliberate failure to address this issue during the negotiations leading up to the Agreement. As the court noted in National Steel, 75 F.3d at 1152, had the Steel Companies wanted to avoid the risk that an amendment would exclude 1986 credits, they could have negotiated for an explicit term fixing the refund-calculation formula.[7] Bethlehem cites authority for

_____

7. During such negotiations, the Steel Companies could also have bargained for an anti-retroactivity clause protecting the method-of-

12

the proposition that one contracting party is bound by the other's intent if the first party knows or should know of this intent. See, e.g., Sunbury Textile Mills, Inc. v. Comm'r, 585 F.2d 1190, 1195 (3d Cir. 1978) (citing 3 A. Corbin, Corbin on Contracts S 543, at 140 (1960), and Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 775 (3d Cir. 1972)). But in this case, Bethlehem is not merely requesting that this court, like the courts in Sunbury and Emor, interpret an existing contract term according to the parties' subjective understanding of that term. Instead, it asks us to infer that the parties subjectively intended (or that the IRS knew that Bethlehem intended) the Agreement to include an additional term not discussed in the document's substantive provisions. There is no basis for us to conclude that the IRS knew that Bethlehem so intended. As for the Steel Companies, the evidence shows that at the time of their negotiations with the IRS, they were aware of the possibility of retroactive amendment in light of the discrepancy between the statutory language and the legislative intent regarding treatment of 1986 credits, but chose not to discuss it.

Bethlehem contends that in addition to alerting the IRS to its intention to include the 1986 credits, the Claim Form prepared by the IRS incorporated this refund-calculation method into the Closing Agreement. The Claim Form was drafted by the IRS and signed and submitted by Bethlehem as part of the same series of negotiations between the IRS and the Steel Companies as the Agreement. Pursuant to the Agreement, Bethlehem's submission of the Claim Form triggered the IRS's prompt release of Bethlehem's refund. Therefore, Bethlehem contends that we must consider the

_____

calculation term. Bethlehem makes much of the fact that the Steel Companies did not negotiate for the anti-retroactivity clause, and that the IRS added it to the Closing Agreement unilaterally. Perhaps the companies' failure to bargain for an anti-retroactivity clause was part of their strategy not to call to the agency's attention the 1986-credit discrepancy and the possibility of future technical corrections bills. However, this failure now undermines Bethlehem's argument that the parties understood the Agreement to fix permanently a particular refund-calculation method.

13

Claim Form in interpreting the Agreement. See Williams v. Metzler, 132 F.3d 937, 947 (3d Cir. 1997) (" `A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.' ") (quoting Restatement (Second) of Contracts S 202(2) (1981)). Because the Claim Form refers to "existing carryforwards as defined in [TRA S] 212(g)(2)," App. at 36, the company asserts that consideration of the form demonstrates that the refund-calculation method was a term of the Agreement.

Consideration of the Claim Form does not, however, alter our agreement with the District Court's finding that the Closing Agreement's overriding purpose was to delineate the timing and procedures for distributing the Steel Companies' claimed S 212 refunds promptly and did not address the substance of the refunds' amount or calculation. The Closing Agreement's requirement that the companies submit Claim Forms to trigger distribution of their claimed refunds comports with TRA S 212(a)'s requirement that each company affirmatively elect to cash out its carryforwards in order to receive such a refund. Moreover, the Claim Form was not signed by the IRS. The parties' decision to exclude the refund calculations from the body of their Agreement reinforces our understanding of this document as limited to the three enumerated terms expressly described therein.

Bethlehem's remaining arguments, that the District Court's interpretation of the Agreement is inappropriate because it deprives Bethlehem of any benefit of the Agreement and renders the anti-retroactivity clause meaningless, see Arnold M. Diamond, Inc., 180 F.3d at 522 (" `[A]n interpretation which gives a[n] . . . effective meaning to all the terms is preferred to [one] which leaves a part . . . of no effect.' ") (quoting Restatement (Second) of Contracts S 203 (1981)), are unavailing. The Agreement expedited Bethlehem's receipt of over $140 million.8  Although Bethlehem argues that this does not constitute a benefit

_____

8. McCambridge testified at his deposition that the Steel Companies' primary objective in their negotiations with the IRS was to accelerate the release of their claimed refunds, due to the time value of money. See App. at 93-94.

14

because Congress intended the IRS to effectuate a quick release of the S 212 refunds, the TRA did not specify a procedure or timeline for the refund. The Agreement did both, and there was no guarantee that the IRS would otherwise have released the money as promptly as it did in the absence of more specific legislative guidance. 9 The clause prevents the application of retroactive amendments affecting the express terms of the agreement, such as the statute of limitations for challenging the refund and the reinvestment deadline. The lack of such amendments in this case does not obviate the effect of the clause.

V.

In conclusion, the Closing Agreement's substantive provisions discuss only the timeline for issuing, reinvesting, and challenging Bethlehem's S 212 refund, and the manner of reinvestment of the refund. The document never mentions the amount of the refund or the method for refund calculation. In light of the Agreement's self-consciously limited scope, its silence regarding these matters unambiguously demonstrates that they were simply not terms agreed upon by the parties. An examination of the extrinsic evidence of record confirms this interpretation of the Agreement's plain language.

Therefore, we find as a matter of law that the Agreement's limited anti-retroactivity clause does not protect Bethlehem from the retroactive TAMRA exclusion of 1986 credits from the S 212 refund calculation and we will affirm the District Court's summary judgment rulings to this effect.10

_____

9. For example, McCambridge's letter summarizing the Steel Companies' February 1988 meeting with the IRS stated that "[t]he first issue [the IRS] raised was that [it] did not think[it] had the authority to disburse funds without passage of the technical corrections bill because the specific refund procedure is contained only in the technical corrections bill, not in the original statute." App. at 77 (Letter from McCambridge to Arnett of 2/5/88); see also App. at 104 (McCambridge Deposition).

10. In response to inquiry by this court, both parties agree that the recent filing by Bethlehem Steel for bankruptcy has no effect on this matter.

15

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16