The **PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
Plaintiff

v.

**Paul M. PRUSKY, Steven G. Prusky, Defendants.**

**Civil Action No. 04–462.**

United States District Court,
E.D. Pennsylvania.

Feb. 8, 2007.

See also 44 Fed.Appx. 545.

Jeffrey D. Fox, John Moustakas, Michael K. Isenman, Thomas J. Mikula, Goodwin Procter LLP, Washington, DC, for Plaintiff.

David H. Weinstein, Andrea L. Wilson, Weinstein Kitchenoff Asher LLC, Philadelphia, PA, for Defendants.

## *MEMORANDUM*

STENGEL, District Judge.

This declaratory judgment action concerns the interpretation of the parties' rights and obligations under a life insurance contract. Before the court are two cross motions for summary judgement. For the reasons stated below, I will deny both motions.

## I. BACKGROUND

Plaintiff The Prudential Insurance Company of America ("Prudential") is a life insurance company organized under the laws of New Jersey and with its principal place of business in New Jersey. Am. Compl. ¶ 8. In 1997, defendant Steven Prusky purchased a flexible premium survivorship variable universal life insurance contract (the "Contract") from Prudential. *Id.* ¶¶ 12, 19. The insureds under the Contract are Paul Prusky and his wife Susan Prusky. Defs' Statement Undisputed Facts ¶ 4. The Contract is a "second to die" contract, which means that the minimum death benefit amount of $50 million is payable on the death of the later of Paul or Susan Prusky. *Id.*

In 1998, Steven Prusky assigned this Contract to his father, defendant Paul Prusky, who is a citizen of Pennsylvania. Am. Compl. ¶¶ 8, 12. The Contract is now owned by the Pruskys on behalf of the Windsor Securities, Inc. Profit Sharing Trust. Pl's Statement Undisputed Facts ¶ 4.

The terms of this Contract are the subject of this litigation. The parties were engaged in a previous lawsuit before Judge Schiller involving the same Contract. In that suit, the Pruskys challenged Prudential's decision to change the daily deadline for making transfers—the "valuation time"—from 4:15 to 4:00 p.m.. After a bench trial, Judge Schiller issued extensive findings of fact and conclusions of law, ruling in favor of Prudential (the "Prior Decision"). *See Prusky v. Prudential Insurance Co. of America*, No. 00–2783, 2001 WL 34355665, 2001 U.S. Dist. LEXIS 24080 (E.D.Pa. Nov. 1, 2001) *aff'd* 44 Fed. Appx. 545 (3d Cir.2002) (nonprecedential). On November 17, 2005, this court determined that the parties were bound by Judge Schiller's factual findings. *Prudential Ins. Co. of Am. v. Prusky*, No. 04–0462, 2005 WL 3110990, 2005 U.S. Dist. LEXIS 28676 (E.D.Pa. Nov. 17, 2005) ("November 17, 2005 Decision").

Steven and Paul Prusky are sophisticated investors with specific experience in mutual funds and variable life insurance. Am. Compl. ¶ 14. Paul Prusky is President and owner of Windsor Securities, Inc. and has a controlling interest in MFI Associates. *Id.* ¶ 15. Both companies are registered with the Securities and Exchange Commission (the "SEC") and combined have over $200 million under management. *Id.* The Pruskys engage in an investment strategy commonly referred to as "market-timing." *Id.* ¶ 16. This strategy attempts to take advantage of short term changes in the investment market by making frequent transfers among mutual fund investment options on a daily or almost daily basis. While market timing is not illegal, the SEC has expressed concern that this practice can harm other fund shareholders by diluting the value of their shares and disrupting the management of the investment portfolio. Pl's Mem.Opp'n Defs' Mot. Summ. J. pp. 3–4.

## A. Contract Negotiations

Judge Schiller made extensive findings of fact concerning the parties negotiations leading up to the formation of the Contract. In the November 17, 2005 Decision, this court determined that three of these rulings were binding on the parties in this proceeding.

William Van Pelt, III and William Van Pelt, IV acted as the Pruskys' agents in negotiating and acquiring the Contract; all information known to the Van Pelts is imputed to the Pruskys. November 17, 2005 Decision, 2005 WL 3110990, **3–4, 2005 U.S. Dist. LEXIS 28676, at *12–14. During the contract negotiations, the parties spent a significant amount of time discussing the transfer issues that are now before the court. The Pruskys asked for assurances that they could make facsimile and telephone transfers and that the transfer cut-off time would remain at 4:15 p.m. for the life of the Contract. Prudential, while noting that this was their current practice, refused to grant these conditions.

On September 4, 1997, Steven Prusky wrote to William Van Pelt III requesting clarifications and assurances as to four items. Am. Compl. Ex. C. Specifically, Prusky instructed Van Pelt III to obtain assurances that the cut-off time for making transfers would not change and guaranteeing phone and facsimile transfers for the life of the contract. *Id.* On September 10, 1997, Van Pelt forwarded these requests to David Johnson, a Prudential representative and specifically suggested that the

Contract be supplemented with a sentence reading "[d]aily telephone, written and facsimile transfer requests will be allowed throughout the life of the contract." *Id.* This request led to discussions between the parties and Prudential sent several letters in response to this request. Thomas Beresford sent a draft letter to Van Pelt III on September 15, 1997 by facsimile. Am. Compl. Ex. D. On the cover sheet he stated "[y]ou'll note we are not comfortable guaranteeing administrative procedures for the contract lifetime." *Id.* The draft letter that followed the cover sheet reinforced this position, as did another letter dated September 16, 1997. Am. Compl. Ex. E.

On September 16, 1997, during the negotiation period, Thomas Beresford received a facsimile memorandum from Van Pelt IV proposing different language.. Pl's Resp. Opp'n Defs' Mot. Summ. J. Ex. 3 Second Beresford Decl. ¶ 10–11. Van Pelt IV proposed that Prudential add the following language to the Contract:

> Prudential will accept daily transfer requests received by facsimile so long as facsimile technology continues to be widely used in business office environments and making such requests by facsimile continues to be permitted by law. In the event that facsimile technology is no longer widely used in business office environments, Prudential will accept requests via a successor technology, provided that such technology is generally recognized to exist. *Id.* ¶ 11.

Prudential did not agree to either change proposed by the Pruskys. It did not agree in writing to extend daily telephone and facsimile requests for the life of the Con-

tract or daily transfers via a successor technology. This is memorialized in a September 18, 1997 letter from David Johnston to Steven Prusky, which states that in regards to guaranteeing daily facsimile or telephone transfers:

> … let me first emphasize that daily transfers are allowed throughout the life of the contract. While we can provide this assurance, Prudential cannot make the representations you request regarding the administrative matters raised by Items 2, 3, and 4. While it is our intent to continue these business practices in the future, there may come a time when a modification to our practices would be made due to legal, technological or business reasons. We would only envision changing these practices if we did so for all policyholders of a class of policies. Am. Compl. Ex. F.

The court has already determined that the Pruskys received this letter. November 17, 2005 Decision, 2005 WL 3110990, **4–5, 2005 U.S. Dist. LEXIS 28676 at *14–18.

Even though Prudential provided no written guarantee to allow daily transfers through a particular medium, Beresford testified that prior to finalizing the Contract with the Pruskys, he was aware that they intended to conduct frequent transfers. Defs' Resp. Opp'n Pl's Mot. Summ. J. Ex. A. Beresford Dep. p. 103. When asked whether he told the Van Pelts "that Prudential was willing to guarantee daily transfer requests, but that the issue was the technology by which the requests would be transmitted to Prudential," Beresford said that this was a "fair characterization" of the parties negotiations. *Id.* pp. 107–108.[1] The September 18 letter

---

1. Prudential contradicts this assertion by including a subsequent declaration from Beresford, in which he states that "I did not promise and did not intend to promise that Paul. M. Prusky and Steven G. Prusky could submit transfers by telephone, facsimile, or other im-

mediate medium of transmission for the life of the contract." Pl's Mem. Opp'n Defs' Mot. Summ. J. Ex. 3. Second Dec'l Beresford ¶ 4. For the purposes of this motion, all inferences regarding disputed facts must be made in favor of the Pruskys as the non-movants.

also emphasizes that although Prudential could not guarantee transfers in any particular form, it could assure that "daily transfers are allowed throughout the life of the contract." Am. Compl. Ex. F.

## B. Contract Formation and Transfer Terms

This court has already adopted Judge Schiller's ruling that the parties formed the Contract on November 8, 1997. November 17, 2005 Decision, 2005 WL 3110990, *3, 2005 U.S. Dist. LEXIS 28676 at *9. Further, the Pruskys are bound by Judge Schiller's determination that the Contract is integrated. *Prudential Ins. Co. of Am. v. Prusky*, 413 F.Supp.2d 489, 495 (E.D.Pa.2005). The Contract consists only of the policy and the attached copy of the application. *Id.* at 492. While Judge Schiller determined that "the Contract is unambiguous to the extent that it does not provide a specific valuation time" and that "Prudential specifically refused to guarantee that the valuation time would remain unchanged or that transfer requests by facsimile or telephone would be accepted for the life of the Contract during the Contract negotiations," Judge Schiller did not determine whether the Contract provision governing transfers was ambiguous. *Id.* at 493. This narrow issue is now before this court.

The Contract provisions on transfers states that:

> You have the right to transfer amounts into or out of investment options up to twelve times in each contract year without charge if the contract is not in default, subject to certain restrictions depending on an investment's class.[2] We may charge for additional transfers in any contract year as we state under Adjustments to the Contract Fund. . . . To make a transfer, you must

ask us in a form that meets our needs. Unless otherwise restricted, the transfer will take effect on the date we receive your notice at our Home Office. Am. Compl. Ex. A p. 14.

This clause does not describe the manner in which an investor can make a transfer; it does not specifically allow telephone or facsimile transfer requests. Steven Prusky made almost daily transfers between subaccounts funds by fax from 1998 to 2004. Defs' Mot. Summ. J. Decl. Steven Prusky ¶¶ 19–20.

In December of 2003, Prudential notified policy holders that "[a]s part of our general authority to restrict transfers," it had implemented New Transfer Policies effective on January 1, 2004. Am. Compl. Ex. G. These new procedures state that:

> . . . we will allow you to effect up to 20 transfers each calendar year by telephone, fax, electronic means, or by mail. Once that limit has been reached, we will accept subsequent transfer requests only if they are in a form acceptable to us, bear an original signature in ink, and are sent to us by U.S. regular mail. After you have submitted 20 transfers in a calendar year, a subsequent transfer request by telephone, fax, or electronic means will be rejected . . . *Id.*

These New Transfer Policies applied to the Pruskys' Contract. Pl's Mot. Summ. J. Ex. 3. Decl. Ernest Crabtree ¶ 2. Prudential adopted this policy to discourage market timing. *Id.* ¶ 4. Prudential asserts that this policy change does not limit the number of transfers a contract owner can submit but only defines "the manner in which certain requests must be submitted to Prudential." *Id* ¶ 6. Beginning on February 17, 2004, and each year after the first 20 transfers, Prudential refused to

---

**2.** The Pruskys' fund was a Class One Investment, which entitled the Pruskys to "transfer amounts into or out of these investment." Am. Compl. Ex. A p. 14.

effectuate transfers by fax. Defs' Mot. Summ. J. Decl. Steven Prusky ¶¶ 26–29.

Prudential filed a complaint on February 2, 2004 seeking a declaratory judgement and injunctive relief to establish the parties rights and obligation under the Contract. Prudential amended the complaint on April 23, 2004. On December 1, 2004, the Pruskys counterclaimed for breach of contract. Two prior court rulings have narrowed the litigated issues. On July 22, 2005, the court granted in part and denied in part Prudential's motion to dismiss. 413 F.Supp.2d 489. On November 18, 2005, the court ruled that issue preclusion prevented the parties from relitigating three contested issues regarding the formation of the Contract. November 18, 2005 Decision, 2005 WL 3110990, 2005 U.S. Dist. LEXIS 28676.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party initially bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial *Celotex* burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. A fact is "material" only when it could affect the result of the lawsuit under the applicable law, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Id.* The moving party must establish that

there is no triable issue of fact as to all of the elements of any issue on which the moving party bears the burden of proof at trial. *See In re Bressman,* 327 F.3d 229, 237–38 (3d Cir.2003) (citations omitted).

After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Williams v. West Chester,* 891 F.2d 458, 464 (3d Cir.1989). A motion for summary judgment looks beyond the pleadings and factual specificity is required of the party opposing the motion. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The non-moving party may not merely restate allegations made in its pleadings or rely upon "self-serving conclusions, unsupported by specific facts in the record." *Id.* Rather, the non-moving party must support each essential element of its claim with specific evidence from the record. *See id.*

A district court analyzing a motion for summary judgment "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in favor of that party. *Hugh v. Butler County Family YMCA,* 418 F.3d 265, 267 (3d Cir.2005) (citations omitted). The standards governing cross-motions for summary judgment are the same, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Grove v. City of York,* 342 F.Supp.2d 291, 299 (M.D.Pa. 2004). Summary judgment is therefore appropriate when the court determines that there is no genuine issue of material fact after viewing all reasonable inferences in favor of the non-moving party. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Interpreting a contract is a legal question appropriate for disposition on summary

judgment. *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir.1999).

## III. DISCUSSION

A federal court sitting in diversity must apply the conflict of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Pennsylvania choice of law rules, claims arising from an insurance policy are governed by the law of the state in which the policy was delivered. *Cat Internet Servs., Inc. v. Providence Washington Ins. Co.*, 333 F.3d 138, 141 (3d Cir.2003). In this case, delivery of the Contract occurred in Pennsylvania and therefore Pennsylvania law applies.

### A. Prudential's Breach of Contract Claim

Interpreting a contract is a question of law and "the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Currid v. Meeting House Rest., Inc.* 869 A.2d 516, 519 (Pa.Super.2005) *appeal denied* 584 Pa. 694, 882 A.2d 478 (2005). "The strongest external sign of agreement between contracting parties is the words they use in their written contract." *Mellon Bank v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001,-1009–10 (3d Cir.1980) (applying Pennsylvania law). Therefore, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* at 1010. A court should not "torture" the contractual language to create ambiguities where none existed. *Wall St. Aubrey Golf v. Aubrey*, No. 05–5027, 189 Fed.Appx. 82, 85, 2006 U.S.App. LEXIS 13817 at *6–7 (3d Cir. June 5, 2006).

A court should be equally cautious in deciding, from its own point of view, that a contract is clear. The Third Circuit has explained that to decide whether a contract is ambiguous, the court must consider "... the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Bethlehem Steel Corp. v. United States*, 270 F.3d 135, 139 (3d Cir.2001).

### (1) The Contract is silent as to the frequency and method of making transfers.

Both parties argue that the Contract is not ambiguous yet advance different interpretations of the Contract. Prudential argues that the Contract gives them complete discretion to dictate how a transfer is made and that although the Pruskys asked for telephone and facsimile transfers for the life of the Contract, Prudential turned down this request. The Pruskys contend that the Contract gives them a right to make daily transfers and some form of near instantaneous communication is necessary to effectuate this right.

The Contract is silent as to the frequency and method of transferring between sub-accounts. The Contract gives the investor "the right to transfer amounts into or out of investment options up to twelve times in each contract year without charge if the contract is not in default, subject to certain restrictions depending on an investment's class." Am. Compl. Ex. A p. 14. Since the Pruskys' fund was a "Class One Investment" they were permitted to "transfer amounts into or out of these investments." *Id.* None of these provisions guarantee daily transfers and the Pruskys are unable to point to any other clauses that guarantee the right to make daily transfers. The Contract does not specify the method by which an investor effectuates a transfer. Instead, the Con-

tact states "[t]o make a transfer, you must ask us in a form that meets our needs." *Id.* This sentence does not guarantee the investor the right to use any particular transfer method but one that meets Prudential's needs.

The Pruskys ask the court to read this silence as prohibiting Prudential from imposing limits on the right to transfer "[i]n the absence of any such express limit" in the Contract. Defs' Memo. Opp'n Pl's Mot. Summ. J. p. 6.[3] The Pruskys assert that the Contract places no limit on their right to trade. This position is contrary to the plain language of the Contract. The Pruskys argue that the Contract does not authorize Prudential to restrict sub-account transfers in Class One investments. The Contract lists different restrictions depending on whether the investment is a Class One, Class Two, or a Class Three investments. Class One investors are permitted to transfer amounts into or out of the investment sub-accounts. Placing less restrictions on Class One investors, as opposed to Class Two or Three investors, does not mean that Prudential has placed no restrictions on Class One investors.

Prudential suggests that this court should follow Judge Schiller's analysis in the prior decision. In that case, Judge Schiller had to determine whether the Contract guaranteed a 4:15 p.m. cut-off time for making transfers among sub-accounts. Judge Schiller reasoned that the cut-off time was not a term of the Contract because the Contract did not address this

subject and "[t]he Contract did not need to supply a transfer cut-off time to constitute a final and complete expression of the terms of the agreement. . . ." Prior Decision Conclusion of Law ¶ 17. In this case, the Contract does address transfers but it does not detail the frequency and method for making transfers. The plain language of the Contract suggests that these details will be left up to Prudential's discretion.

In this court's earlier decision, the court decided to defer a dispositive ruling on whether the Contract was unambiguous at the motion to dismiss stage because extrinsic evidence could reveal a latent ambiguity. 413 F.Supp.2d at 494. For the purposes of this action, the court must construe all inferences in the Pruskys' favor and consider whether the extrinsic evidence the Pruskys proffer shows that the Contract is ambiguous. *Bethlehem Steel Corp.* 270 F.3d at 139.

**(2) Prudential has not previously conceded that the Contract allows daily transfers.**

█ Since the Pruskys cannot point to affirmative language in the Contract allowing daily transfers, they argue that Prudential has conceded that the Contract allows for daily transfers. This argument fails because Prudential's prior stipulation was limited to the prior decision and is therefore not binding on them in this case.

In support of this argument, the Pruskys rely on a finding of fact from the Previ-

---

**3.** The Pruskys further argue that Prudential was obligated under contract law principles to reserve authority to restrict daily transfers. In support of this legal argument, the Pruskys cite two cases construing federal and state retirement pensions. The Pruskys cite Judge Becker's dissent and concurrence in *Flick v. Borg–Warner Corp.*, 892 F.2d 285, 292 (3d Cir.1989). Judge Becker's analysis focused on requirements of trust law, not contract law and therefore is not controlling. The Pruskys

also reference *Commonwealth ex rel. Zimmerman v. Officers and Employees Retirement Board.*, 503 Pa. 219, 469 A.2d 141, 144 (1983). While this opinion does focus on contract law, the portion of the opinion the Pruskys cite is a concurrence. The Pruskys cite no other authority from the Pennsylvania Supreme Court to support this principle and therefore, this court does not find it controlling.

ous Decision that "[t]he Contract entitles its owner to transfer amounts between and among sub-accounts as often as daily on any day that the New York Stock Exchange is open for business. (Stip. Facts 41)." Prior Decision Finding of Fact ¶ 63. While the parties stipulated to that fact, they expressly limited the stipulation to the prior litigation

The general rule is that stipulations remain binding during subsequent proceedings between the parties. *Waldorf v. Shuta,* 142 F.3d 601, 616 (3d Cir.1998) However, a prior stipulation does not continue to bind the parties "if they expressly limited it to the first proceeding or if the parties intended the stipulation to apply only at the first trial." *Id. See also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. e. "A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action . . . . nor is it actually litigated if it is the subject of a stipulation between the parties. A stipulation may, however, be binding in a subsequent action between the parties if the parties have manifested an intention to that effect." The court will follow this general rule and find that this stipulation from the prior decision does not bind Prudential in this case.[4]

The Pruskys point to two other instances to argue that after the Contract was formed, Prudential reconfirmed that daily transfers would be allowed throughout the life of the Contract. First, the Pruskys reference a May 15, 2000 letter to Steven Prusky from Clifford Kirsch, Chief Counsel of Prudential Variable Projects. Defs' Memo. Opp'n Pl's Mot. Summ. J.

Exs. D & E. This letter states that Prudential had reserved the right to change the time of transfers and anticipated changing the cut-off time from 4:15 to 4 p.m. in the future. *Id.* Prudential then went on to reference the September 18, 1997 letter, discussed above, where Prudential had told the Pruskys that it might change its current practices for legal, technological, or business reasons. The second example proffered by the Pruskys is the deposition testimony of Thomas Beresford. *See* Defs' Memo. Opp'n Pl's Mot. Summ. J. Ex. A Beresford Dep. p. 108. These two examples both concern pre-contract negotiations. This evidence is relevant in determining the intentions of the parties but does not create binding contractual obligations or prove that Prudential conceded that the Contract permits daily transfers.

**(3) Parol evidence suggests the Contract is ambiguous because the parties intended the Contract to include a right to daily transfers.**

Generally, extrinsic evidence of pre-contractual oral or written negotiations is barred by the parol evidence rule. *Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425, 436 (2004). However, a court can consider extrinsic evidence to decide whether a contract is ambiguous. *Bethlehem Steel Corp.,* 270 F.3d at 139. Additionally, if the court finds the contract is ambiguous, "parol evidence is admissible to explain or clarify or resolve the ambiguity" and ascertain the intent of the parties. *Id.* at 437 (internal citations omitted). The court must look to the parties' "outward and objective manifestations of assent, as opposed to their

---

4. The Pruskys argue that the court should apply the doctrine of judicial estoppel to estop Prudential from denying that the Contract entitles investors to daily transfers. Judicial estoppel prevents parties from playing "fast and loose" with the court by changing posi-

tions throughout litigation. *See generally New Hampshire v. Maine,* 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). This doctrine does not trump the well established exception to preclusion noted in RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. e.

undisclosed and subjective intentions" when determining their intentions. *Espenshade v. Espenshade,* 729 A.2d 1239, 1243 (Pa.Super.1999).

■ In September 1997, the Pruskys, through their agents the Van Pelts, negotiated with Prudential to try to incorporate the following language into the Contract: "daily telephone, written and facsimile transfer requests will be allowed throughout the life of the contract." Prudential refused this request on September 18, 1997, noting that while it was their current practice to permit transfers in this format, "there may come a time when a modification to our practices would be made due to legal, technological or business reasons." The Pruskys also pushed for Prudential to include language permitting daily transfers by successor technology if facsimile was no longer widely used. Prudential did not agree to amend the Contract with this statement either. These objective manifestations show that the Pruskys could not have rationally believed that the Contract included a promise that they would be able to make transfers via phone, facsimile, or successor technology for the life of the Contract. Additionally, the plain language of the Contract suggests that Prudential has the power to restrict the date on which the transfer will take effect. *See* Am. Compl. Ex. A. p. 14 "Unless otherwise restricted, the transfer will take effect on the date we receive your notice at our Home Office." This also cuts against the Pruskys' position that the parties bargained for daily trading. While the parties' negotiations show Prudential was unwilling to guarantee its current business practices regarding methods of effectuating transfers, some extrinsic evidence suggests the parties intended that the Contract would include the right to make daily transfers.

There are three key pieces of evidence. First, in the September 18 letter, Pruden-tial states that it can assure the Pruskys that "daily transfers are allowed throughout the life of the contract." This is reinforced by the second piece of evidence: the testimony of Thomas Beresford that he assured the Pruskys' that daily transfers would be accepted throughout the life of the contract during their negotiations. Defs' Resp. Opp'n Pl's Mot. Summ. J. Ex. A. Beresford Dep. pp. 107–108. Beresford also testified that he was aware that the Pruskys intended to make frequent transfers between sub-accounts. *Id.* Third, in the prior decision, Judge Schiller found that the Pruskys' "most desired feature was the ability to make transfers every business day" and that this was a "first filter" in selecting investment vehicles. Prior Decision Finding of Fact ¶ 139. The course of performing the Contract may support the Pruskys position as well, since Prudential permitted the Pruskys to make almost daily transfers between sub-accounts by fax for nearly six years until the new policies went into effect on January 1, 2004.

This extrinsic evidence suggests that the parties intended for the Contract to allow for daily transfers. In order to use the right to make daily transfers, there must be some mechanism for instantaneous communication. *Prusky v. Aetna Life Ins.,* No. 03–6264, 2004 WL 2384967, *3, 2004 U.S. Dist. LEXIS 21597 at *9 (E.D.Pa. Oct. 25, 2004) (noting that "it is undisputed that the defendants' restriction allowing communications solely by regular U.S. mail eliminates any possibility of daily movement of funds from one sub-account to another."). Sending trade requests by United States mail will not effectuate the right to daily transfers.

**(4) The court will not apply the rule of *contra proferentem.***

■ The Pruskys also argue that the court should apply the rule of *contra prof-*

*erentem,* which requires courts to construe ambiguous documents in favor of the insured and against the insurer who drafted the contract. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999). The Pruskys made this same argument before Judge Schiller, who found that since "evidence of negotiations between the parties evinces the parties intent, the Court need not fall back upon the maxim of *'contra proferentem.'* " Prior Decision Conclusion of Law ¶ 25; *see also Burns Mfg. Co. v. Boehm,* 467 Pa. 307, 356 A.2d 763, 767 n. 3 (1976) (stating that *contra proferentem* is not intended "as a talismanic solution to the construction of ambiguous language"); RESTATEMENT (SECOND) OF CONTRACTS § 206 Interpretation Against the Draftsman Reporter's Note cmt. a noting that "the rule has less force when the other party has taken an active role in the drafting process, or is particularly knowledgeable." The court will follow Judge Schiller's decision not to apply *contra proferentem* since the Pruskys are sophisticated investors and there is evidence of the parties' negotiations and intentions in entering the contract.

### (5) The court will defer applying the doctrine of necessary implication.

Alternatively, the Pruskys argue that the court should apply the doctrine of necessary implication to find that Prudential breached the Contract by restricting the method of making transfers. The doctrine acts to "imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." *Frickert v. Deiter Bros. Fuel Co.,* 464 Pa. 596, 347 A.2d 701, 705 (1975) (Pomeroy, J. concurring) (quoting *D.B. Van Campen*

*Corp. v. Bldg. & Const. Trades Council,* 202 Pa.Super. 118, 195 A.2d 134, 136 (1963)). This doctrine operates in the absence of an express contract provision when the parties did not anticipate or form an understanding on an issue. *Id.*

After making a determination on the facts in dispute, the court may find that this doctrine applies and affords the Pruskys a basis for relief. Prudential knew the Pruskys wanted to trade daily to pursue their investment strategy and assured the Pruskys that it would guarantee daily transfers. Years after the parties contracted, Prudential changed its policies in response to the SEC's concern with market timing. If the parties did not anticipate this external change, the court may use the doctrine of necessary implication to imply an agreement between the parties to allow instantaneous communication to facilitate daily trading.

### B. The Pruskys' Counterclaim

The Pruskys' counterclaim for breach of contract arises from the same set of facts as Prudential's breach of contract claim and is simply an affirmative attack on Prudential's new policies. Accordingly, the same analysis applies and the court cannot grant summary judgment to the Pruskys.

### C. Affirmative Defenses and Relief

The Pruskys ask the court to rule on Prudential's affirmative defenses to their counterclaim. Prudential also argues that the Pruskys are not entitled to equitable relief. The court will defer consideration of these issues until it construes the contract and determines whether there has been a contractual breach.

### IV. CONCLUSION

I will deny both motions for summary judgment. An appropriate order follows.

### ORDER

**AND NOW,** this 8th day of February, 2007, upon consideration of plaintiff's motion for summary judgment (Document No. 61)and defendants' motion for summary judgment (Document No. 62) and the responses thereto, it is hereby **ORDERED** that both motions are **DENIED.**